## COMMONWEALTH vs. TYRONE DIXON.

Bristol. April 10, 1997. - June 12, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, & FRIED, JJ.

*Evidence,* Cross-examination, Bias, Impeachment of credibility. *Practice, Criminal,* Cross-examination by prosecutor, Argument by prosecutor, Comment by prosecutor, Capital case. *Witness,* Bias, Credibility, Impeachment.

At the trial of a murder case the judge did not abuse his discretion in allow-
ing the prosecutor to cross-examine a defense witness as to whether she
was involved in the crime and, if so, whether that involvement provided
a motive to lie, where the prosecutor made a plausible showing that
circumstances existed on which the witness's bias would be based.
[227-228]
Error, if any, in the admission of evidence that two defense witnesses had
been brought to court in the custody of the police under a bench warrant
because they had not appeared when summonsed, was not prejudicial,
where it only demonstrated reluctance to testify and not bad acts and
where the prosecutor impeached those witnesses with their drug use and
prior inconsistent statements. [228-230]
At the trial of a murder indictment the prosecutor's closing argument had a
foundation in the testimony; other argument not objected to was permis-
sible; improper reference to a concession that defense counsel "prob-
ably" would make (but did not) was not shown to be prejudicial, nor
were two other prosecutorial misstatements in light of the judge's
instructions. [230-235]
No reason appeared in a murder case for this court to exercise its power
under G. L. c. 278, § 33E, to order a new trial or reduce the verdict.
[235-236]

INDICTMENT found and returned in the Superior Court Department on December 2, 1992.

The case was tried before *Daniel A. Ford,* J.

*Charles K. Stephenson* for the defendant.

*Shaun S. McLean,* Special Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant, Tyrone Dixon, was convicted of murder in the first degree. We affirm the conviction and

conclude there is insufficient reason to grant a new trial or reduce the degree of murder under G. L. c. 278, § 33E.

## I

On September 29, 1992, at about 8 P.M., off-duty Officer Randall Rogers of the Taunton police department heard a loud noise and ran to the scene of an automobile accident. He discovered Jeffrey Poissant slumped over behind the wheel of a red Beretta which had struck a utility pole. Poissant had been shot twice in the chest and, although he appeared to be conscious when Rogers arrived, he died shortly after arriving at a local hospital. Six bags of marihuana were found strewn about inside the automobile, and a seventh bag was found later in the console of the automobile.

No identifiable fingerprints were found on the automobile, on the bags of marihuana, or on the alleged murder weapon which was discovered two days later in a window well at the Dewert housing project (Dewert). The defendant was said to frequent Dewert. Two witnesses, John "Jay" Gomes and Derick Jeffreys, testified that a few weeks prior to the shooting, the defendant had shown them the gun which the police later discovered.[1] A ballistics expert testified that the bullets which killed Poissant could have come from the gun in question, but that he could not make a conclusive determination. The police discovered a baseball cap in the automobile. Analysis showed three different types of head hair, one of which was microscopically similar to the defendant's, although that hair could have come from anyone sharing the defendant's racial characteristics.

Jeffreys, a sixteen year old resident of Dewert and friend of the defendant, provided the principal testimony for the Commonwealth. On September 29, Jeffreys had, along with other friends from the Dewert area, attempted to arrange a small purchase of marihuana from Paul Bournazian, Poissant's brother-in-law. The deal fell through for lack of transportation. The defendant, some time later that day, approached Jeffreys and asked him if he would "watch his back while he go do something." Gomes, one of the individuals who had

[1]The gun that the police discovered and about which Gomes and Jeffreys testified was distinctive in that it had black electrical tape around the handle and was held closed by a screw to compensate for a missing cylinder pin.

tried to set up the earlier purchase, testified that he saw Jeffreys and the defendant leave Dewert together on bicycles.

Jeffreys testified that they rode to Bournazian's apartment to pick up the marihuana, and that they met Bournazian outside. About that time, a red Beretta passed by, and the driver honked the horn, drove around the block, and stopped at the end of the street. Presumably the marihuana was to be delivered from the Beretta. It was in this vehicle that the victim was found a short time later. The defendant had refused to pay until he saw the marihuana, so he and Bournazian had walked to the car, sending Jeffreys the other way to avoid having an unnecessary witness to the transaction.

After leaving the defendant with Bournazian, Jeffreys rode around on his bicycle and encountered Alexandra and Ermelinda Almeida. Ermelinda testified that Jeffreys said he was looking for the defendant and that they should stay inside if they heard gunshots.[2]

Bournazian went looking for Poissant about five minutes after returning to the apartment. When he saw the police at the scene where the Beretta had crashed into the utility pole, he fled. Later that evening, after he found out that Poissant had been killed, Bournazian went to the police and named Jeffreys and "Tyrone" as the two young men who had come to buy marihuana. He testified that he and the defendant had sent Jeffreys up the street while he took the defendant to see Poissant. Bournazian left as the defendant got into Poissant's automobile to drive around the block and look at the marihuana before purchasing it. At the police station, Bournazian was asked to pick the defendant out from several photographs. He identified a picture of Charles "Smooth" Robinson from an array of photographs which did not include the defendant's. Bournazian said the young man in the photograph was the killer if his name was Tyrone. Bournazian picked out a photograph of the defendant the next day. At trial, Bournazian explained that he had trouble distinguishing between the defendant and Robinson in pictures because he thought they looked alike, but he could tell them apart in person because they spoke differently, had different mannerisms, and Robinson wore a lot of gold jewelry. Before going to the police and before he knew Poissant had been killed,

---

[2]Whether Jeffreys said he was "waiting for" or "looking for" the defendant was a matter of some controversy at the trial.

Bournazian had told a friend that Jeffreys and the defendant were the ones who had come for the drugs.

Jeffreys testified that, while he was waiting down the street with Ermelinda Almeida, the defendant came running and called to him. The defendant jumped on Jeffreys' bicycle, and, as they rode away, the defendant admitted shooting Poissant. According to Jeffreys, the defendant said he had pulled the gun out and told Poissant, "This is how it's going to go down. I'm going to get out of the car nice and easy." At that point, Poissant reached for the gun, and the defendant shot Poissant four times, at least once in the face.[3] Jeffreys and the defendant got off the bicycle in the woods nearby, and the defendant showed Jeffreys the gun which held four empty shells. At that point, Jeffreys and the defendant met up with several friends from the area, five of whom identified at trial the defendant as the young man with Jeffreys.

Jeffreys and the defendant took a taxi cab back to Dewert. The driver identified the defendant because the driver knew the defendant's family, but he could not pick the defendant out of an array of photographs.

At Dewert, Jeffreys found several of the defendant's friends, including Nicolas Hollingsworth and Gomes, led them to the defendant, and then left. Gomes testified that the defendant was trying to get a ride out of town.

The defendant, who did not testify, relied on vigorous cross-examination of the prosecution's witnesses regarding numerous inconsistent statements given to the police and the grand jury. He also claimed an alibi supported by several witnesses. Alexandra Almeida, whose sister Ermelinda had testified for the Commonwealth, testified that the person who called out to Jeffreys right after the shooting occurred was an Hispanic male, not the defendant, who is African-American. Kendra Alves testified that she drove the defendant and her friend, Hollingsworth, to Brockton at about 6 P.M., stopping off at the defendant's mother's apartment on the way. The mother's companion testified that he saw the defendant there at around 7 P.M. (the killing had taken place at about 8 P.M.). The defendant's sister, Gina, who lived in Brockton, testified that the defendant arrived at her house at about 7 P.M., stayed until 9:30 P.M., and returned later to spend the night. The

---

[3]There was evidence of only two shots, both to Poissant's chest.

defendant's other sister, Roxanne, testified that he had arrived at her apartment about 9:30 P.M. She testified that they watched a movie, drank, and smoked marihuana before the defendant left for the night to stay with Gina. Roxanne admitted initially lying to the police at the defendant's father's request in stating that the defendant had spent the night at her apartment. The Commonwealth pointed to this and other inconsistencies in the stories of the alibi witnesses.

## II

### A

The defendant first complains that the prosecution improperly attacked the credibility of key defense witnesses. The prosecutor asked Kendra Alves if she saw her friend, Nicolas Hollingsworth, with the gun; if she were aware that disposing of a murder weapon and aiding a murderer in his flight were criminal offenses; and whether she would want to keep Hollingsworth out of trouble. The defendant objected at trial on the grounds that the questions were unduly prejudicial and lacked an adequate foundation. The prosecutor replied that she had a good faith basis for the questions because the police had received an anonymous tip that Alves's friend, Hollingsworth, had been seen at Dewert with the murder weapon; and another witness, who was never called because the police and the prosecutor determined his testimony was unreliable, stated that Hollingsworth had helped the defendant to get to Brockton after the murder. After a lengthy bench conference, the judge decided to allow the questions.

"It has long been the law in the Commonwealth that parties are entitled as matter of right to reasonable cross-examination of a witness for the purpose of showing bias." *Commonwealth* v. *Michel*, 367 Mass. 454, 459 (1975). Such evidence can be crucial, and is rarely a collateral issue. *Commonwealth* v. *LaVelle*, 414 Mass. 146, 153 (1993). In this case, Alves was a critical witness for the defense because she was the primary alibi witness who was not a member of the defendant's family. It was a critical point in the trial that both Alves and Hollingsworth were possibly involved and so may have had a motive to lie to conceal that involvement. Thus, such involvement would certainly be a proper subject

of cross-examination, and such evidence is not rendered inadmissible just because it suggests that the witness might have been involved in criminal activity. *Commonwealth* v. *Redmond,* 357 Mass. 333, 338 (1970).

The defendant, however, claims that the prosecutor lacked a good faith basis for asking the questions. The prosecutor is not entitled to "imply the truth of a proposition which [she] knew to be false" in the course of her cross-examination. *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 415 (1978). A lawyer, if asked by the judge, must be able to "make a plausible showing that the circumstances existed on which the alleged bias is based" in order to question a witness regarding bias. *Commonwealth* v. *Bui,* 419 Mass. 392, 401, cert. denied, 516 U.S. 861 (1995). Although the Commonwealth's information regarding Alves's and Hollingsworth's involvement was derived from questionable sources, an anonymous tip and an unreliable witness, we conclude that the judge, in the exercise of his substantial discretion in controlling the scope of cross-examination designed to show bias, *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 280, cert. denied, 371 U.S. 852 (1962), did not err in allowing this line of inquiry. Testimony placing Hollingsworth with the defendant after the murder, Alves's testimony that she drove the defendant to Brockton that evening (although at an earlier time than the prosecutor claimed), and substantial evidence suggesting that the defendant went to Brockton much later than Alves testified, provided a sufficient basis for the inference that Alves and Hollingsworth may have been involved in the defendant's flight to Brockton. Accordingly, the prosecutor was entitled to examine the witness as to whether she was involved, and, if so, whether that involvement provided a motive to lie.

## B

The other improper impeachment that the defendant claims occurred when the prosecutor elicited testimony from police witnesses that Alexandra and Ermelinda Almeida had been brought to court in the custody of the police under a bench warrant because they had not appeared when summonsed. Evidence of an arrest is generally not a proper subject for impeachment of a witness. *Commonwealth* v. *Smith,* 26 Mass. App. Ct. 673, 675 (1988). See *Commonwealth* v. *Bishop,* 296

Mass. 459, 461-462 (1937). The Appeals Court has held that this is particularly applicable to defense witnesses because the argument that the witness may be trying to gain favor with the government to obtain preferential treatment is not available:

> "As to defense witnesses, it is a far less persuasive proposition that if they are somehow in the toils of the law, they will, for that reason alone, be disposed to testify falsely against the government and in favor of the defendant. It is more likely that evidence of pending charges simply discredits, i.e., smears, the witness."

*Commonwealth* v. *Smith, supra* at 676. Such evidence is generally of little value for proper purposes, because there is only a weak inference from the arrest to a generalized bias against the government which is not sufficient to undermine the defense witness's testimony. And the evidence is prejudicial and inflammatory because it permits the government to put before the jury ordinarily inadmissible evidence of bad acts and bad character to "smear" the witness, before the charges have been confirmed by a conviction. The *Smith* opinion, however, carves out an exception to this rule where the facts point to the "possibility of a *particularized* bias," especially where the arrest is somehow connected to the case in which the witness is testifying (emphasis supplied). *Id.* at 678. In this case, the witnesses were arrested to ensure that they would appear to testify. A desire not to testify against the defendant or to become involved in the proceedings could be inferred from their failure to appear on their own. The fact that it was necessary to arrest these witnesses to compel them to testify in this case could be the basis for an inference of some bias or some desire not to assist the government.[4] That both witnesses testified in ways more favorable to the defendant at trial than had been expected, based on their earlier statements to the police, bolsters the Commonwealth's contention that something about being arrested and being forced to testify against the defendant might have biased the sisters in favor of the defendant. Contrast *Commonwealth* v. *Haywood*, 377 Mass. 755, 762-763 (1979).

---

[4]Although one of the sisters was a defense witness and was arrested at the request of defense counsel, it does not appear that the witness knew that the defense had instigated her arrest.

Even if the admission of the evidence of the arrests was improper, the error would not have been prejudicial. See *Commonwealth* v. *Smith, supra* at 678-679; *Commonwealth* v. *Liberty*, 27 Mass. App. Ct. 1, 6-7 (1989). These arrests did not show bad acts or illegal activity such as would otherwise be inadmissible as overly prejudicial or inflammatory. The arrests only demonstrated that these witnesses were, for whatever reason, reluctant to testify in this case. Moreover, it is not as if the prosecution had succeeded in this way in casting doubt on testimony otherwise importantly helpful to the defense. On the contrary, the prosecutor was able to elicit much more damaging testimony impeaching these witnesses regarding drug use and prior inconsistent statements. In this context, it is hard to see how the jury's knowledge that these witnesses were brought into custody to compel their testimony would have prejudiced the defendant.

### III

The defendant's other principal contention is that the prosecutor's closing argument was inflammatory, not based on the evidence, and prejudicial. We consider the prosecutor's argument as a whole. See *Commonwealth* v. *Loguidice*, 420 Mass. 453 (1995). The defendant points to the following four passages within the closing argument:

1. Referring to the defendant and most of the witnesses, the prosecutor said that "these people" come from "a world unlike anything you've ever experienced," "a whole different planet." She described them as "hav[ing] a whole different moral code" where "their idea of accomplishment and pride and joy is hangin' out, having babies when you're sixteen years old, being cool, smoking pot, knowing more about guns and revolvers than you do about arithmetic." She argued that the police are the enemy in this community and that there is a code not to testify "against one of their own" and be labeled a "fink." Based on this conception of the Dewert community, the prosecutor argued that Jeffreys and other witnesses for the prosecution should be believed because they testified "at great expense to themselves" by breaking the community's moral code. The defendant argues that this argument was inflammatory and prejudicial to the defendant and hints that the comments might have had racial overtones as the defendant "is African-American and his jury was overwhelmingly white."

As applied to the witnesses on both sides and the defendant, the prosecutor's statement had a foundation in the testimony at trial. There was extensive testimony of marihuana use, most of the young female witnesses had children or were pregnant, and most of the young people were neither in school nor working. As to the "code" of not testifying against their friends, that too was in evidence. Gomes stated that he lied to the grand jury because he was fearful of his reputation and possible adverse consequences at Dewert. One of the female witnesses initially denied knowing the defendant because she did not want to become involved. Officer Warren Offley testified that Jeffreys had said "he was afraid of the repercussions in the project and he didn't want to be known as a snitch." Offley also testified as to experience with the difficulties of obtaining cooperation from these young people as a former resident of Dewert and as a Taunton police officer for twenty-five years. Thus, this was not an example where reversal is required because a prosecutor made arguments without a factual basis. See, e.g., *Commonwealth v. Lamrini*, 392 Mass. 427, 432 (1984).

Although the phrase "these people" is sometimes used to refer in a global sense to groups — whether defined by race, class, location, or many other characteristics — who are perceived as different from and are despised by those among whom the words are used, in this context, it is at least as likely that the prosecutor intended her words to refer just to the defendant and the witnesses, as to whom they constituted permissible argument. Moreover, she may have had the permissible intention of asking the jury to make the imaginative leap to understand a world different from their own and to judge fairly. The remarks about the "code" of silence, as to which there was ample evidence, were appropriate for just this reason and referred particularly to the prosecution's own witnesses. In this respect, it is worth noting that immediately before this argument, defense counsel had launched a withering attack on the prosecution's witnesses, characterizing them as liars not worthy of belief. Further, we note that defense counsel, who was aggressive and skillful in his conduct of the defense, did not object to this remark. See *Commonwealth v. Kozec*, 399 Mass. 514, 518 n.8 (1987) ("The absence of objection by defense counsel during or after argument may provide some guidance as to whether a particular argument was prej-

udicial in the circumstances"). And finally, the trial judge's charge and his general instructions were so careful and balanced and must have left the jury with such an impression of the importance of their task that any possible prejudice would have been dispelled. *Id.* at 518.

The defendant also complains of the prosecutor's statement that Gomes was "afraid of Tyrone." Gomes had stated at trial, "I was scared . . . Tyrone would get somebody after me or something like that," when he was explaining why he had lied to the grand jury. Thus, the statement by the prosecutor was a permissible attempt to marshal the evidence before the jury. *Commonwealth* v. *Raymond*, 424 Mass. 382, 390 (1997).

2. The defendant argues that the prosecutor made inappropriate references to the waiver of privileges protected by the Fifth Amendment to the United States Constitution and the legal consequences of testifying falsely to bolster the credibility of prosecution witnesses. This also was not objected to. In reference to the testimony of Gomes, the prosecutor said:

> "He didn't have to testify in this case. He could've taken his Fifth and walked and nothing could have ever happened to that kid. But he gets on the stand and he implicates himself in a drug deal, and he implicates himself to a certain degree in the murder of this person."

The prosecutor further argued that the jury should credit the testimony of Derick Jeffreys: "Why would Derick Jeffreys ever point the finger at Tyrone, knowing that he can get in big trouble for perjury, if Tyrone was not the person who was with him that night?" Gomes had already testified that he was aware that he "didn't have to testify in court if [he] knew that it was going to hurt [him]." Gomes admitted on the stand that he was implicating himself in a drug transaction. The testimony was elicited during the prosecutor's direct examination of Gomes in order to lay out why Gomes was testifying differently at the trial than he had before the grand jury. That earlier testimony was put before the jury without objection, and we see no reason why the prosecutor's reference to it in her closing was any more prejudicial than the earlier testimony. The prosecution is entitled to argue from the evidence that its witnesses were credible, *Commonwealth*

v. *Raymond, supra* at 391, and the fact that Gomes's own testimony, which he could have avoided giving at all, put him at risk is a factor the prosecutor may put before the jury. See *Commonwealth* v. *Donovan*, 422 Mass. 349, 357-358 (1996) (argument that jury should believe witness's testimony because he took some of the blame proper). The only authority the defendant cites, *Commonwealth* v. *Hesketh*, 386 Mass. 153, 156-158 (1982), concerns the quite different situation where a defendant wanted to call a witness simply to elicit the response that the witness was invoking his Fifth Amendment privileges.

As to the statement regarding the trouble Jeffreys could get into by committing perjury, the Commonwealth argues that the prosecutor misspoke and that the prosecutor intended to allude to the possibility that Jeffreys, like Gomes, may have implicated himself in drug transactions and as an accessory to murder. Defense counsel did not object to this statement. The testimony at trial made it clear that Jeffreys could have gotten into trouble based on his testimony, and the prosecutor was entitled to make reference to that possibility. The prosecutor referred specifically to perjury which had no basis in the evidence introduced at trial, but we think it is within the common knowledge of the jury that lying on the stand at a murder trial could subject a witness to punishment.

The defendant makes a further argument with respect to the perjury comment. He argues that Jeffreys is in much the same situation as a witness who testifies for the government in exchange for a lighter sentence. In those cases, we have stated that the government must be particularly careful not to vouch for the credibility of the witness. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 260-265 (1989). *Ciampa* is inapposite because, in this case, unlike *Ciampa*, there was no promise made by the witness to provide truthful testimony for the government. Even if there had been such an agreement, this statement does not imply, as do the cases requiring reversal on this ground, that the government has any special ability to ensure that the witness testifies truthfully. Contrast *Commonwealth* v. *Meuse*, 38 Mass. App. Ct. 772, 773-776 (1995), *S.C.*, 423 Mass. 831 (1996) ("[W]e have an army of police that can go out and corroborate every detail [the witness] is giving us").

3. The prosecutor stated, "You all know, and [defense

counsel] will probably concede, that Derick Jeffreys was not the shooter that night; he didn't shoot [the victim]." Unlike the other errors the defendant claims in the prosecutor's closing argument, defense counsel objected to this statement. The judge agreed that it was "something . . . better left unsaid." The judge offered to give a curative instruction, but defense counsel declined because he felt there was little which could be said to correct the error and that it was "just too risky." The prosecutor should not have made the remark given that there was no evidence that defense counsel would have made such a concession. In fact, defense counsel would have no reason to eliminate any doubt in the minds of the jurors by conceding even the most unlikely possibility without some strategic purpose. On the facts of this case, however, there was no prejudicial error. There was no evidence presented which would suggest that Jeffreys was the shooter in this case, and, in fact, the testimony from the Almeida sisters and Paul Bournazian strongly corroborated Jeffreys's story that he was not at the scene of the shooting. Defense counsel suggested that someone else, quite possibly Charles "Smooth" Robinson, was the real killer, but he never, even in his cross-examination of Jeffreys, attempted to shift the blame onto Jeffreys. The lack of evidence pointing to Jeffreys, the lack of any attempt by defense counsel to portray Jeffreys as a potential suspect, and the prosecutor's use of the qualifier "probably" in reference to defense counsel's concession convince us that the defendant was not prejudiced by this statement.

4. The prosecutor made reference to the defendant's arrival at his sister Roxanne's apartment at 10 P.M., about two hours after the shooting. The only evidence for this was a prior inconsistent statement made by Roxanne which had been admitted only for impeachment. The defendant points to cases where we have set aside verdicts where the prosecutor has argued evidence admitted for a limited purpose as substantive proof. See, e.g., *Commonwealth* v. *Johnson*, 412 Mass. 318, 322-324 (1992); *Commonwealth* v. *Rosa*, 412 Mass. 147, 156-159 (1992). In this case, the statements were not prejudicial because Roxanne herself testified that the defendant did not arrive at her apartment until 9:30 P.M., and that it was her sister Gina who testified to his arrival at her apartment at an earlier time. Second, the statement by the prosecutor was an

isolated reference in a lengthy discussion of the police investigation which was meant to explain why the police did not continue their investigation after arresting the defendant. The police had before them Roxanne's earlier statement concerning the 10 P.M. arrival time, not her subsequent trial testimony, when they arrested the defendant.

We conclude that the prosecutor's misstatements, taken together, do not come close to constituting the degree of prejudice which would warrant a new trial. We are aided in this conclusion by the fact that experienced trial counsel objected only to the remark regarding the possibility that defense counsel would concede that Jeffreys was not the shooter, and that the judge instructed the jury that closing arguments were not evidence and that the jurors' own memories and perceptions were controlling. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987).

## IV

The defendant asks us to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the verdict in order "to obtain a result 'more consonant with justice.' " *Commonwealth* v. *Garabedian*, 399 Mass. 304, 316 (1987), quoting *Commonwealth* v. *Davis*, 380 Mass. 1, 15 n.20 (1980). The defendant argues that such an exercise of our power is warranted by the cumulative effect of any errors we might discover in the course of our review and because the defendant was only eighteen years old at the time of the shooting, had no prior criminal record, had studied at a "Christian military school," was acquitted of acting with premeditation, and "had lived an otherwise honorable life." That the defendant had no prior criminal record, attended a Christian military school, or lived an honorable life were not in evidence at the trial, but rather are argued to us in the defendant's appellate brief as reasons to mitigate the degree of guilt.[5] Having reviewed the entire record, we are satisfied that the evidence warranted the conviction of murder in the first degree and that none of the errors the defendant claims

---

[5]There are allegations, however, also not presented at trial but conceded in the defendant's appellate brief, that he was an uncharged suspect in another shooting which had occurred just a few weeks before the one in which he was convicted of murder.

undermines our faith in the fairness of the jury's verdict. We conclude that the interests of justice do not require a new trial or entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*