## COMMONWEALTH vs. KENT K., a juvenile.

Suffolk. May 6, 1998. - July 7, 1998.

Present: WILKINS, C.J., LYNCH, FRIED, MARSHALL, & IRELAND, JJ.

*Evidence,* Prior misconduct, Police report, Relevancy and materiality, Exculpatory, Expert opinion, Photograph. *Practice, Criminal,* Argument by prosecutor, Instructions to jury. *Witness,* Expert.

At a murder trial, a prosecution witness's comment that the photographs, including the juvenile's photograph, shown to eyewitnesses were of persons who had been arrested was not prejudicial in light of the judge's forceful instruction to the jury to disregard the comment. [756-757]

In a criminal case, the Commonwealth's late production of a statement to police by the juvenile did not prejudice the juvenile, where the statement contained material that was either inadmissible or would not have helped the juvenile's case. [757-759]

At a trial of a murder indictment, any improper appeals to the jury's sympathy in the prosecutor's opening and closing arguments were unlikely to have had any significant influence on the jury in light of the compelling evidence and the judge's limiting instructions to the jury. [759-762]

There was no merit to a juvenile's claims of error based on the withholding of an allegedly exculpatory police report [762]; the judge's instruction on joint venture [762]; the judge's proper exclusion of expert testimony regarding the reliability of eyewitness testimony [762]; the judge's conclusion that the photographic array was not suggestive [762-763]; or the judge's refusal to grant a hearing on the admissibility of certain polygraph evidence [763].

INDICTMENTS found and returned in the Superior Court Department on December 13, 1994.

The cases were tried in the jury session of the Boston Division of the Juvenile Court Department before *Robert W. Banks,* J., sitting under statutory authority, and a motion for a new trial was heard by him.

*Stephen B. Hrones* for the juvenile.

*Eric Neyman,* Assistant District Attorney (*Amanda Lovell & Robert Tochka,* Assistant District Attorneys, with him) for the Commonwealth.

FRIED, J. After a bench trial in the Boston Division of the Juvenile Court Department at which the juvenile was found delinquent by reason of murder in the first degree, assault and

battery by means of a dangerous weapon, armed assault with intent to murder, and possession of a firearm, he claimed an appeal. G. L. c. 119, § 56, as amended through St. 1992, c. 379, §§ 17-19. At a jury session in the Juvenile Court the juvenile was found delinquent of these charges. The trial judge committed him to the Department of Youth Services until he reaches twenty-one years of age, at such time to be transferred to the Department of Correction to complete his sentence of from eighteen to twenty years. G. L. c. 119, § 72, as amended by St. 1992, c. 379, § 16. After the denial of the juvenile's motion for a new trial, his appeal was entered in this court. We affirm.

I

On October 31, 1994, the nine year old victim was shot as he played with his siblings and friends in front of a neighbor's home in the Roxbury section of Boston. As they stood in the yard, the group, which included two supervising adults, saw two individuals walking quickly toward them, both wearing black clothes with dark hoods. Several witnesses described one of the two men, the juvenile, as light skinned, with freckles and a short haircut. As the group watched, the two men produced firearms and began firing over a fence into the yard. Witnesses testified that the juvenile put his weapon over the fence, pushed back his hood, and fired repeatedly. Approximately sixteen to seventeen shots were fired from the two weapons. The victim and an adult were hit. After the shooting, the two assailants ran to a waiting vehicle which drove away. The victim later died in surgery as a result of a gunshot wound to his left chest.

Over the next several hours, various individuals identified the shooters to the police. After being taken to a hospital with the victim, the victim's mother, who was inside a neighboring house at the time of the shooting, stated that she saw the juvenile through a window as he approached the yard and had an unobstructed view of his body and face. She described him as approximately six feet tall, between sixteen and seventeen years of age, with freshly cut hair, light skin, and freckles. At the police station, a family friend who was with the children in the yard during the shooting examined six books, each containing 300 photographs of young black males. He identified the juvenile from a two year old photograph in the sixth book, although he said that the juvenile's face looked more slender in the photograph than he recalled. He then identified the juvenile

again from a newer photograph placed in an array of eight photographs. The police then showed the same array to the victim's mother at the hospital. She immediately identified the juvenile from the array. The police then showed the array to the victim's brother, but he was unable to make an identification. Later, the victim's mother, brother, and the family friend all separately identified the juvenile in a lineup.

The juvenile exercised his right to a de novo trial by jury in November, 1996. The juvenile, his mother, and his grandmother testified at trial that the juvenile was at home on the night of the murder. The juvenile's mother and grandmother testified that their apartment had a heavy steel door with dead bolt locks, and that they would have heard the juvenile if he had left the home. The juvenile alleged that on the day following the shooting, another individual confessed to him to having done the killing. On November 27, 1996, the jury found the juvenile delinquent of first degree murder based on deliberate premeditation and extreme atrocity or cruelty. The juvenile was also found delinquent of all other charges, and was sentenced to an eighteen to twenty year term for the murder. The juvenile's motion for a new trial was denied, and the appeal was docketed in this court.

## II

### A

The juvenile argues that various errors infected his trial. First, he claims that he was irretrievably prejudiced by the admission at trial of testimony by a police officer indicating that the juvenile had been arrested previously for an unrelated offense. Evidence of prior bad acts may not be admitted to prove bad character or criminal propensity, but may be offered for other relevant purposes. See *Commonwealth* v. *Rodriguez*, 425 Mass. 361, 370 (1997), and cases cited. Weighing probative value against possible prejudice lies in the judge's discretion, and we do not disturb the decision made unless "palpably wrong." *Id.*

On direct examination by the prosecutor, Detective Darrin P. Greeley described the origin of the photographs used in the books shown to the victim's mother:

> *Q.*: "The persons that are in those books, are those persons from Boston and from outside of Boston?"

> *A.*: "The persons who have ever been arrested within the

> city of Boston from different suburbs. They're from
> the general geographic area around Boston, or anyone
> in the state actually, anybody's who's just been ar-
> rested in Boston."

The judge then questioned the detective about his answer, and
the juvenile moved for a mistrial. After a brief sidebar confer-
ence on the matter, the judge denied the juvenile's motion but
gave a forceful curative instruction to the jury.[1]

The judge did not abuse his discretion in denying the
juvenile's motion. The curative instruction adequately instructed
the jury to ignore the testimony. See *Commonwealth* v. *Valentin*,
420 Mass. 263, 270-272 (1995) (affirming judge's denial of mo-
tion for mistrial and curative instruction where testimony was
introduced that photograph in array was from juvenile's prior
arrest). Although Detective Greeley's comment informed the
jury that the juvenile had been previously arrested for some of-
fense, it provided no information to the jury about what sort of
prior offense was implicated, nor how serious that offense was.
Given the judge's emphatic instruction and the limited nature of
the evidence, there was no prejudicial error.

## B

Second, the juvenile argues that he was prejudiced by the
Commonwealth's failure to disclose a police report containing
the juvenile's pretrial statement until the middle of the jury
trial. During the initial bench trial and at the start of the jury
trial, the juvenile moved for production of any statements made
to the police. The Commonwealth asserted repeatedly that no
such statement existed. The Commonwealth now concedes that
it erred, and that the juvenile made a statement to Detective
Daniel Keeler shortly after the shooting and prior to his arrest.
The prosecutor claims that he was unaware of this statement

---

[1] The judge told the jury the following:

"[A] witness has taken the stand and has testified that the books that he
used . . . contain photographs, all of which were of people who were ar-
rested at some time in the past. Now, that is for you to hear and . . .
consider . . . . I instruct you notwithstanding whatever you determine the
evidence to be that if you do determine that this juvenile might have been
arrested sometime in the past, that you are to disregard that completely.
Disregard that factor completely in this trial. It has nothing to do with the
case, and it should not be in the trial, and I am striking it from the record.
On top of that, I am telling you that that must be disregarded."

until it was brought to his attention during the jury trial, when the two-page written report about the statement was immediately turned over to defense counsel.[2]

The Commonwealth concedes, and we emphasize, that such discovery should have been provided the juvenile when originally requested.[3] In the face of repeated requests by counsel for specific and identified information, there should be no room in the criminal justice system for such carelessness — if that is what it was. The question, however, is whether the juvenile suffered prejudice as a result of the Commonwealth's inaction. He did not. The juvenile's statement to the police contains only a generic denial of the accusations against him, which is inadmissible evidence in the Commonwealth, see, e.g., *Commonwealth* v. *Nawn*, 394 Mass. 1, 4 (1985), and cases cited, and hearsay evidence — the juvenile's statement to the police that another individual admitted shooting the victim — that would not have helped the juvenile at his bench trial or at his trial by jury. Although the juvenile claims that knowledge of the police report would have bolstered defense counsel's opening statement by permitting reference to the juvenile's willingness to talk to the police immediately after the shooting, this argument is unpersuasive because defense counsel may not allude in his opening statement to evidence that he does not reasonably believe in good faith may be adduced during the trial. See S.J.C. Rule 3:08, DF 12, 382 Mass. 807 (1981). See also *Lovett* v. *Commonwealth*, 393 Mass. 444, 449 n.6 (1984).[4] The juvenile

---

[2]The lead investigator in the case, Detective Mahoney, contradicted the Commonwealth's claims. Detective Mahoney testified that he received the written report from the arresting officer, Detective Keeler, shortly after the arrest. He testified that he turned it over to the district attorney two years prior to trial, when asked for all the information in the juvenile's file.

[3]This incident suggests either serious misconduct or negligence. During the juvenile's original bench trial, defense counsel questioned Detective Mahoney at length about the issue of pretrial statements. Detective Mahoney denied repeatedly that a statement was taken from the juvenile. Later, during the jury trial, he admitted that a statement was taken and that he had received the written report.

[4]The juvenile also argues that discovery of the police report would have aided him at the original bench trial. Given the inadmissibility of the report, however, this is unconvincing. Moreover, the juvenile's argument that the report would have allowed him to impeach the bench trial testimony of the lead investigator is circular: had the report been disclosed prior to the bench trial, it is unlikely that the lead investigator would have testified as he did.

therefore suffered no prejudice as a result of the Commonwealth's discovery error.

## C

The juvenile's most substantial claim is that the prosecutor's opening and closing arguments appealed impermissibly to the jury's sympathies. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 494 (1997). Throughout the two arguments, the prosecutor referred to the victim as a "nine-year old boy," a "little boy," and a "little nine-year-old boy." The prosecutor referred to the victim as his mother's "little baby boy," and repeatedly mentioned that the victim was shot on his birthday and on Halloween. The juvenile argues that *Santiago* is controlling, and that the statements constituted prejudicial error requiring a new trial.[5]

This case differs from *Santiago* in several important respects. First, the juvenile does not suggest that the prosecutor introduced witnesses primarily for their sympathetic effect or strayed beyond the evidence during his summation.[6] In *Santiago*, the prosecutor called the victim's sister as the Commonwealth's first witness, but she testified to little of relevance and mostly attempted to elicit sympathy from the jury. *Id.* at 496-497. Moreover, in his closing argument the prosecutor in *Santiago* stated that the defendant used a small boy as a human shield, which was not a fact in evidence. *Id.* at 499. This serious error was not cured. *Id.* at 502-503. In the instant case, however, no such defects compounded the prosecutor's embellishments in his opening and closing arguments. The juvenile's claim to a new trial is thus weaker than the claim in *Santiago*.

Second, the theory of extreme atrocity or cruelty was an issue in this trial, making relevant and permissible some of the prosecutor's references to the victim's age. Both indifference to

---

[5]Defense counsel objected to these statements at trial, and thus we review the record for prejudicial error. See *Commonwealth* v. *Santiago*, 425 Mass. 491, 494-495 (1997). Under this standard we consider whether "the error possibly weakened [the juvenile's] case in some significant way so as to require a new trial." *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983).

[6]As long as the prosecutor does not stray beyond the evidence, he may use opening and closing arguments to set the scene, even if unfavorable to the defendant. See *Commonwealth* v. *Lyons*, 426 Mass. 466, 472 (1998) (prosecutor may depict grisly crime scene); *Commonwealth* v. *Dixon*, 425 Mass. 223, 230-231 (1997) (prosecutor may describe habits of defendant and witnesses in detail as background).

or taking pleasure in the victim's suffering and consciousness and degree of suffering of the victim are relevant to whether the juvenile acted with extreme atrocity or cruelty. See *Commonwealth* v. *Murphy*, 426 Mass. 395, 402 (1998); *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983). The juvenile approached a group of children and fired repeatedly at them, even as they lay injured on the ground. It is likely that young children would have experienced particular terror and confusion during such an extended and vicious assault. Thus, some of the prosecutor's references to the victim's age were justified to highlight both the suffering that the victim likely experienced and the juvenile's intention to inflict or indifference to that suffering.

Similarly, the prosecutor's most compelling appeal for the jury's sympathy occurred as he described the victim's suffering by quoting the victim's own words to the paramedics as they transferred him to the hospital:

> "[H]e's lying in that pool of blood. The ambulance driver comes in and he says to the ambulance driver, 'Are you going to help me, are you going to help me?' And they put him in the van and they take him to the hospital. Enroute to the hospital, he tells the ambulance people, 'It's my birthday. It's my birthday. My candy's all over the floor. I have a pain in my chest.'"

This statement was clearly relevant and permissible to show the conscious suffering and distress that resulted from the victim's injuries and the fact that the assault had interrupted his birthday and Halloween celebration.

Third, some of the prosecutor's comments regarding the age of the victim and the fact that the shooting occurred on the victim's birthday were relevant to counter the juvenile's theory that there was a conspiracy among several of the witnesses making the eyewitness identifications. Defense counsel argued that the identifications by the victim's mother, brother, and family friend were tainted because the family friend — who first identified the juvenile from over 1,500 photographs at the police station — might have described the juvenile to the other eyewitnesses prior to their identifying him and procured their false identification. The prosecutor addressed this in his closing by saying that "[the juvenile] wants you to believe that while [the

victim's mother] is there in the hospital, worrying about her little boy, her youngest baby is on the operating table and is going to die, that they're all concocting some type of story now to . . . identify the freckled-faced kid." This description of the scene at the hospital was justified to respond to the juvenile's assertions regarding the identifications.

These explanations for the prosecutor's comments greatly reduce, but do not completely eliminate, our concern about the possibility of emotion clouding the jury's determination. The repeated return to the highly emotional facts that the victim was very young and that it was his birthday was improper. We must therefore consider the possibility that some residue of improper argument unduly prejudiced the juvenile.

We conclude that no new trial is required. The judge specifically mentioned sympathy in his attempt to cure any defect in the prosecutor's closing statement.[7] Cf. *Santiago*, *supra* at 501 (judge failed to discuss sympathy in jury instructions). Moreover, in *Santiago* we made clear that "the strength of the Commonwealth's case is particularly crucial where improper appeals to sympathy are made." *Id.* Where guilt is clear, improper appeals to sympathy, although troubling, are less crucial than "where the questions are close and difficult." *Id.* In that case, the evidence was such that we could not be certain that the prosecution's improper arguments did not impermissibly sway the jury's deliberations. In *Santiago*, self-defense was a live theory at trial, the Commonwealth's evidence of deliberate premeditation was circumstantial, and there was no compelling evidence that the defendant actually fired the bullet that killed the victim. *Id.* at 502-503. In the instant case, the evidence was much more compelling. The juvenile began shooting at a group of children who were defenseless and in no way provoked the attack. Several eyewitnesses identified the juvenile from police photograph books and photographic arrays in the hours after the shooting occurred. Those witnesses testified with certainty and consistency that the juvenile shot the victim. In the face of such evidence, and given that the jury were already well aware of the victim's age and would undoubtedly have been highly sympathetic to the victim and his family even

---

[7]The judge said: "I want to emphasize to you that the arguments of counsel and their openings are not evidence in the case and that you are not to decide this case on the basis of any emotional factor, the basis of sympathy towards any party."

without prompting from the prosecution, it is most unlikely that the prosecution's appeals to the jury's sympathy had any significant effect. No new trial is warranted.

## D

The juvenile raises several other issues, which we discuss briefly. The juvenile claims that he was prejudiced because he did not have access to an allegedly exculpatory report of a housing police officer about another shooting in Roxbury that occurred on the same day.[8] This claim fails on the merits, because the report would have as likely implicated as exonerated the juvenile had it been introduced at trial, and was of such minor import that it would not have influenced the jury.

Next, the juvenile argues that the judge erred in instructing the jury that they could find him delinquent of murder under a theory of joint venture, because the evidence supported only a theory that the juvenile was the principal gunman. This argument is without merit, given the overwhelming evidence that two shooters were involved and that the juvenile was one of them.

Third, the juvenile claims that it was reversible error to exclude expert testimony regarding the reliability of eyewitness identification. As we have recently reiterated, the decision to exclude such testimony lies in the judge's discretion. See *Commonwealth* v. *Ashley*, 427 Mass. 620 (1998); *Commonwealth* v. *Santoli*, 424 Mass. 837 (1997). The trial judge held a hearing on the juvenile's proffered testimony, and ultimately rejected the juvenile's expert because the testimony "is somewhat elementary, basic, and parallels to a great extent the instructions the jurors receive from judges in criminal cases." There was no abuse of discretion in holding that the expert's testimony would not have been of sufficient benefit to the jury to warrant admission.

Fourth, the juvenile objects to the photographic array used by the police because he claims that he was the only individual in

[8]A youth from the juvenile's neighborhood, named Kamaya Santos, was shot earlier in the evening. The report in question indicates that immediately after that shooting Neico Santos, Kamaya's cousin and a friend of the juvenile, approached Kamaya and asked whether someone from "Academy" — the housing project where the victim in the instant case was later shot — did the shooting. Kamaya answered that it was someone from Academy. The juvenile now claims that this provided Neico Santos with a motive for revenge, thus exonerating the juvenile.

the array with freckles. A pretrial hearing was held on this issue, and the judge denied the juvenile's motion to suppress, finding that the array was not unduly suggestive, that most of the men in the array had light skin, that at least three people in the array had freckles or facial markings, that photographs of from eighty to one hundred males in the six books viewed by one of the eyewitnesses had freckles, and that none of the photographs in the array was distinct because of clothing, jewelry, height, weight, or age. The judge "carefully examined the photographic array . . . and conclude[d] that there is nothing about the photographs themselves or their presentation in the array that would focus attention on the [juvenile's] photograph." Given that the array was shown to the victim's mother and the family friend less than two hours after the shooting, and that neither indicated that the juvenile's freckles, rather than his light skin, served as the primary identifying feature, there was no error. Cf. *Commonwealth* v. *Thornley*, 406 Mass. 96, 100 (1989).

Finally, the juvenile's claim that the judge erred in denying the juvenile a hearing on the admissibility of polygraph evidence is without merit. Polygraph evidence has been inadmissible in the Commonwealth since *Commonwealth* v. *Mendes*, 406 Mass. 201, 212 (1989). Although we suggested in *Commonwealth* v. *Stewart*, 422 Mass. 385, 389 (1996), that a defendant might establish the reliability of a polygraph examination in certain circumstances, the juvenile here made no attempt to meet the very demanding *Stewart* standard relating to the reliability of the polygrapher who conducted his test.

### III

The juvenile does not request, and is not entitled to, review under G. L. c. 278, § 33E. See *Patrick P.* v. *Commonwealth*, 421 Mass. 186, 194-195 (1995).

*Judgments affirmed.*