Cowin, J.
The defendant, Eric Alston, is charged with murder (G.L.c. 265, s. 1) and assault and battery by means of a dangerous weapon (G.L.c. 265, s. 15A(b)). Mr. Alston was originally tried on these matters before a jury in March 1999, and after the jury was unable to reach a verdict, a mistrial was declared. During the course of the trial, however, the defendant was identified by the Commonwealth’s main witness, Ms. Pamela Haggerty. He now moves to suppress that in-court identification on the ground that it was im-permissibly suggestive and violates due process.
*665 A hearing was held on August 12 and 18, 1999 at which the following witnesses testified: Dr. Marion Smith, Ms. Pamela Haggerty, Ms. Elaine Spann and Ms. Barbara Faherty.[1] After hearing and evaluation of the credibility of the witnesses, the Court denies the defendant’s motion.

FINDINGS OF FACT

On September 20, 1993, Ms. Pamela Haggerty, a twenty-five-year-old white woman, consumed five to seven beers at two different bars between 5:00 and 7:00 p.m. Ms. Haggerty, who is six feet tall, did not eat anything during this time period, although she probably had eaten dinner earlier. At about seven p.m., Ms. Haggerty and her friends Joseph Cepkauskas and John Woodward drove in Mr. Cepkauskas' small pickup truck to the north section of Brockton in search of crack cocaine. The group went to two different locations before they arrived at their ultimate destination.
At this point, Ms. Haggerty was under the influence of alcohol. Although she “had done” crack cocaine other times, she had not used any crack that day. She was seated in the front of the small pick-up truck between Mr. Cepkauskas, the driver, who was about 6’2" tall and Mr. Woodward, who was about 5’10" tall. Because of the small size of the passenger compartment, Ms. Haggerty was sitting with her legs arched over Mr. Woodward.
When it was dusk but still light out, the driver of the truck, Mr. Cepkauskas, pulled over on North Main Street in order to talk to a group of five or six young black males about buying some crack. The window on the passenger side was open and Mr. Woodward yelled out asking if anyone had a “20-piece.”[2] A black male came to the truck and talked with Mr. Woodward for about three or four minutes. The black male said that he had a “20-piece” and showed it to Mr. Woodward. Mr. Woodward disputed that this was in fact a “20-piece” and said that he was going to go elsewhere. The fellow said: “No, wait a minute,” and then a second black male approached the truck. The second male got in front of the other male and there was some general conversation between this second male and the three passengers in the truck. The second black man was shorter than the first, with a very round face, a stocky build and very big eyes. He was wearing a bright multi-colored shirt. After a few minutes, this male showed two rocks of cocaine to Mr. Woodward, actually putting his hand in the window of the truck to do so. Mr. Woodward wanted to hold the rocks, but the seller would not part with them unless Mr. Woodward gave him the money. Mr. Woodward was holding a twenty-dollar bill in his left hand, but would not release it. The two men argued for some time about who was going to hold the money and who was going to hold the cocaine. During the argument, the second man’s body was arched over the window and his face was actually in the window. His face was no more than two feet from Ms. Haggerty’s face. His hand was also in the window. The argument about the cocaine was never resolved.
After the argument about the drugs, the second black male spoke directly to Ms. Haggerty. He said he knew who she was and that her name was Jessica. Ms. Haggerty, who is not named Jessica and has never been known as Jessica, kept repeating that she was not Jessica and that he must be mistaken. The more she tried to tell him that she was not Jessica and that her name was Pamela, the angrier he became. He was very enraged, finally spitting from talking so angrily and quickly. He accused Ms. Haggerty of lying. This argument lasted for several minutes, during which time Ms. Haggerty was in eye contact with the man and was looking directly into his face. His face was no more than two feet from hers. Eventually, the man tried to open the truck door and remove Mr. Woodward from the truck in an attempt to reach Ms. Haggerty and pull her out of the truck. Mr. Woodward placed his arm in front of Ms. Haggerty to prevent the male from pulling her out of the truck. Ms. Haggerty had the impression that whoever Jessica was she had done something awful to the man and that the man was trying to even the score.
Mr. Woodward began to tell the driver, Mr. Cepkauskas, to go down the street. Mr. Cepkauskas tried to start the truck several times to no avail. During this time, something was thrown into the truck and it broke and liquid came out of the container. Ms. Hag-gerty was not certain what was thrown into the truck. Ms. Haggerty testified that the entire time the second man was at the window of the car leaning in was about fifteen-to-twenty minutes. I find, however, based upon Ms. Haggerty’s description of the conversation and events that transpired, that the length of time was more likely five-to-ten minutes. Under situations of intense pressure such as the one in which Ms. Hag-gerty was involved, the time usually seems longer than it actually is.
At that point, Ms. Haggerty heard a thud, turned to the window and saw that the arm of the man who had been arguing with her was in the truck. She then turned her attention to Mr. Woodward and saw that he had grabbed his chest. Mr. Cepkauskas finally managed to start the truck and drove away from the scene and to a hospital to seek help for Mr. Woodward. Ms. Haggerty spoke to the police at the hospital and told them about the events of the evening. She intentionally did not tell the police that the group had been out looking for drugs and she also intentionally deceived them as to the exact location where the stabbing had occurred. She said it had happened at another place where they had stopped during their route from the bar to the scene of the stabbing.[3]
Later that evening, in the early morning hours of September 21, 1993, the Brockton Police showed Ms. Haggerty a photo array of eight pictures. She chose one picture and said “If I had to pick somebody out, it *666 would be #3.” She indicated that the eyes of the man in the photo were different from the eyes of the stabber and that she would like to see him in person to be able to be certain of her identification. (A line-up was never arranged.) The defendant’s picture was #3 in the array.
In July 1997, four years later, Ms. Haggerty testified before the grand jury in regard to this case. She was shown the same array she had seen previously. Again, this array included the defendant’s picture. Ms. Hag-gerty was aware that his picture was in the array. She did not identify anyone from the array because she wanted to be absolutely certain before she named anyone as a murderer.
In March 1999, this case was initially tried before a jury. Ms. Haggerty testified on March 16, 1999. Originally she was not asked to identify anyone. After she had been on the witness stand for about one and one-half hours there was a recess. During the recess, Ms. Haggerty approached the Assistant District Attorney who was trying the case and told her that she (Ms. Haggerty) had recognized the defendant Mr. Alston as the man who had been leaning in the truck arguing with her. Ms. Haggerty recognized Mr. Alston when she looked across the room during a side-bar conference and the defendant had his chin down but his eyes were staring directly at Ms. Haggerty and the two made eye contact. Ms. Haggerty then was certain that Mr. Alston was the person whose face she had seen on the night in question in 1993.[4]
At the time that Ms. Haggerty recognized the defendant, there were at least two other young black males in the courtroom. In fact, they were related to the defendant. Although Ms. Haggerty probably knew that the person seated next to the defense attorney was the defendant, that fact did not influence her identification. Further, Ms. Haggerty sought out the Assistant District Attorney and informed her that she had recognized Mr. Alston.[5]
Later in the trial, Ms. Haggerty identified the defendant as the person who had been arguing with her the night of the incident. At the time that she made the in-court identification Mr. Alston was the only black male in the courtroom.
Ms. Haggerty does not wear eyeglasses. She has lived in Brockton, a multi-racial city, all her life. At all relevant times, she has had a number of African-American friends and acquaintances.
The Court has viewed the array (see copy of exhibit 1 attached hereto) that was presented to Ms. Haggerty and the Court also viewed the defendant in the courtroom for a number of hours, face-to-face, in daylight, with no obstructions. When the Court first saw the array, it attempted to choose Mr. Alston’s photo from those presented and was unable to do so despite the fact that he was still seated directly before the Court. The Court then viewed its notes to see which number his photo was in the array. Even after that, the Court had difficulty selecting that photo as one of Mr. Alston. The reason for that is as follows. Mr. Alston has an unusual-looking face. He has two very distinctive features, his eyes (the whites of his eyes are very large and prominent) and the shape of his face. Neither of these features is clear in the photograph. His eyes are half-shut and the whites of his eyes are completely covered by his eyelids. Further, his face is in a shadow, so that the shape of his face is unclear. The Court finds that the fact that Ms. Haggerty could not be 100% certain that the photo in the array was that of the person she had seen earlier that night does not weaken her later in-court identification. In fact, it emphasizes what a strong identification witness she is. The picture makes it difficult to identify Mr. Alston. Ms. Haggerty’s request to see the man in person so that she could be certain of her choice is exactly what was necessary under the circumstances. (The Court recognizes that the photo of Mr. Alston must be several years old at this point. However, the identifying features, his eyes and the shape of his face, presumably have not changed during that time.)
Dr. Marion Smith, a psychology professor at the University of Toronto who concentrates in the area of memory and cognition read the transcript of the first trial and numerous articles regarding the suggestibility of eye-witness identification. Dr. Smith testified as to the problems that she believed were inherent in Ms. Haggerty’s initial identification and in her later in-court identification of the defendant. She testified that weaknesses in the original identification stemmed from the fact that it was cross-racial (i.e., white person making an identification of a black person); that Ms. Haggerty was under the influence of alcohol when she first saw the defendant and that it appeared from the trial transcript that Ms. Haggerty was concentrating on factors other than the defendant’s face at the time of the confrontation. Dr. Smith further testified that the problems with the in-court identification were the possible impact of the prior viewing of the photo array, the long delay between the incident and the trial and the suggestibility of the setting. All of these factors, except for the cross-racial one, are basic and elementary ones. They are applicable in most trials involving an identification and may well be improper as the subject of expert testimony. See Commonwealth v. Kent K., a Juvenile, 427 Mass. 754 (1998).
In regard to the problems of cross-racial identification, the studies cited by Dr. Smith indicate that identifications in general are accurate only seventy-five percent of the time. If the observer is of one race and the face being looked at is of another, the observer does not choose the correct face ten percent of the time and is also likely to identify an erroneous face an additional ten percent of the time. The cross-racial effect would be reduced, however, if the identifying witness were familiar with people of the other race and interacted with them. Since the identifying witness, Ms. Haggerty, grew up in Brockton with friends who were black and has been familiar with black people all *667 her life, I find that the cross-racial effect is reduced, and may well be non-existent, in this case. Even without a history on the witness’s part of cross-racial contact, Dr. Smith indicated that there is only a twenty-percent reduction in accuracy, i.e., a twenty-percent reduction is the defendant’s worst-case scenario.[6] Even adopting the expert’s testimony in toto, the issue remains a jury question and is not a basis for excluding the identification testimony.
In light of the totality of the circumstances, this Court finds that the in-court identification procedure was not unduly suggestive.

RULINGS OF LAW

The burden is on the defendant to establish, by a preponderance of the evidence, that a given confrontation was so unnecessarily suggestive as to give rise to a substantial likelihood of mistaken identification. Commonwealth v. Johnson, 420 Mass. 458 (1995); Commonwealth v. Botelho, 369 Mass. 860, 867 (1976); Commonwealth v. Venios, 378 Mass. 24, 29 (1979). The test is whether, in light of the “totality of the circumstances,” the identification procedure was unnecessarily suggestive of the defendant. Commonwealth v. Santos, 402 Mass. 775, 781 (1988).
In the present case, there were at least two other young black men in the courtroom at the time that Ms. Haggerty recognized the defendant. Moreover, it was Ms. Haggerty who informed the Assistant District Attorney that she recognized the defendant. Further, the fact that the defendant was seated next to his attorney does not indicate that the identification was improperly suggestive. See Commonwealth v. Melvin 399 Mass. 201 (1987); Commonwealth v. Mofett, 83 Mass. 201 (1981).
The fact that the witness had twice previously been shown the same array containing the defendant’s photo does not alone render the identification unduly suggestive. See Commonwealth v. Paszko, 391 Mass. 164 (1984); Commonwealth v. Avery, 12 Mass.Supp.Ct. 97 (1981). In addition, the witness did not identify the defendant’s picture the second time she was shown the array (at the grand jury) even though she had picked it out before. This reduces the likelihood that she was influenced in the in-court identification by having seen the defendant’s picture twice before. Moreover, Ms. Haggerty stated at all times that it was the eyes on which she was focusing and the defendant’s eyes are partly obscured in the photo array. She also was very clear that she wanted to be absolutely certain of her identification before accusing someone of a murder and she believed that she needed to see Mr. Alston in person before she could be certain of her identification.
Ms. Haggerty is a very credible witness. She was not one who could be easily swayed. She has no uncertainty about her identification of the defendant on March 16, 1999.
Although Ms. Haggerty was admittedly under the influence of alcohol at the time of the incident, she was sufficiently in control of her senses to be cognizant of and to remember the exact route the group had taken from the bar to the scene of the stabbing (which route involved a number of different streets and had two different goals before the ultimate stop on North Mam Street) and each turn along the way as well as the route taken when the group left the scene and drove to the hospital. (She was cross-examined in minute detail about these facts and was. able to recite them all.) She could also remember the conversation between the second man and the people in the truck and the position of the individuals at all relevant times. In addition, she was cerebrating sufficiently that night to tell the police the details of the evening while omitting those that might incriminate her and her friends. All these factors are relevant to Ms. Haggerty’s initial opportunity to observe and recognize the defendant; they reduce the likelihood that the in-court identification was suggestive. Commonwealth v. Chotain 31 Mass.App.Ct. 336 (1991).
Further, at the time that Ms. Haggerty originally saw the defendant she had an unusually lengthy time to observe him and she was very close to his face during that time. The two were face-to-face arguing for five-to-ten minutes in the car. This is a very long time to be looking directly at a person and concentrating on his face. It was dusk so the lighting was sufficient.
When Ms. Haggerty was originally shown the array, just a few hours after the incident, when the face of the man involved was freshest in her mind, she chose the picture of the defendant and said that if she had to pick someone she would pick him. An identification made immediately after the fact while the face is freshest in the mind is so important that our courts permit a one-on-one show-up in such circumstances. Commonwealth v. Williams, 399 Mass. 60, 67 (1987). It was at that time that Ms. Haggerty believed that Mr. Alston was probably the man.
Unless there has been an unduly suggestive out-of-court confrontation “there is no constitutional requirement that an in-court identification confrontation be conducted as a lineup or otherwise be free of suggestion.” Commonwealth v. Wheeler, 3 Mass. App, Ct. 387, 39 (1975).[7] Further, any procedure that identifies a defendant when he is unique in the courtroom is necessarily somewhat suggestive. See Commonwealth v. Napolitano, 378 Mass. 599, 604 (1979). Yet in-court identifications are routinely permitted. In this case, the in-court identification was preceded by an identification from a photo array. The fact that the witness, at some point between the two identifications (the grand jury), failed to make an identification of the defendant simply goes to the weight of her identification, not to its admissibility.
Under the totality of the circumstances, the confrontation here was not impermissibly suggestive. *668 Rather, it was a spontaneous identification that arose because of the manner in which the defendant looked at the witness. It was the first time since the initial confrontation that the witness had seen the defendant in person and in such a pose. It was also the first time since the incident that the witness had an opportunity to view the features of this defendant clearly. The in-court identification of the defendant does not violate due process.

ORDER

For the foregoing reasons, the defendant’s motion to suppress is DENIED.

 Ms. Spann is the mother of the defendant and Ms. Faherty is a victim-witness advocate for the District Attorney's office. Their testimony related only to the number of black males in the courtroom during the first trial.

 There was no testimony as to what a “20-piece" was. The Court assumes that it was a $20.00 rock of crack cocaine. In any event, this fact is not relevant to the decision on the motion.

 After Mr. Woodward’s funeral, Ms. Haggerty did provide the police with an accurate account of the night’s events.

 There is some question whether the defendant ever sought a line-up prior to the in-court identification. No such motion was ever filed and the defendant seems to confuse his motion in limine for a voir dire as to identification testimony with a motion for a line-up or non-suggestive in-court identification. There were colloquies with the trial judge regarding the identification. However, there is nothing that this Court has seen or heard that indicates conclusively that the defendant moved prior to trial for a non-suggestive in-court identification. Even when defense counsel seeks such a prophylactic measure, the grant of such a request is within the judge's sound discretion. Commonwealth v. Jones, 375 Mass. 349, 358 (1978). If any such request were made orally at the first trial, it was apparently denied by the trial judge.

 Although there was no testimony on the point, representations of counsel at this hearing and at the original trial of this case are to the effect that the Assistant District Attorney instructed Ms. Haggerty not to volunteer any information and that she would not be asked by the Commonwealth whether she could identify this defendant.

 The Court is not indicating that it adopts this worst-case scenario.

 A motion to suppress on the ground that the photo array was unduly suggestive was denied prior to the first trial.