COMMONWEALTH vs. RICHARD RIVERA.

No. 99-P-899.

Suffolk. October 11, 2000. - November 30, 2000.

Present: JACOBS, KAPLAN, & SMITH, JJ.

*Practice, Criminal,* Challenge to jurors, Instructions to jury. *Jury and Jurors. Constitutional Law,* Jury. *Homicide.*

At the trial of an indictment alleging delinquency by reason of murder in the first degree, the judge properly allowed the Commonwealth's peremptory challenges of two young black males, where the record did not support a conclusion that the challenges were based on improper bias. [534-536]

Any error in a judge's submitting a first degree murder indictment to the jury on a theory of extreme atrocity or cruelty, which was arguably not supported by the evidence, was harmless where the evidence did support the jury's verdict of guilty on the theory of deliberate premeditation. [537]

At a murder trial, the judge's instructions on deliberate premeditation and malice, inferences, and the burden of proof were fair and accurate; an instruction that the jury might infer intent from the condition of the victim's body was correct; and error in the judge's peripheral remark that a person intends the consequences of his voluntary acts did not, in light of the instructions as a whole, warrant reversal of the defendant's conviction. [537-539]

INDICTMENT found and returned in the Superior Court Department on December 5, 1994.

On transfer to the Boston Division of the Juvenile Court Department and subsequent appeal to the jury session of that court, the case was tried before *Mark E. Lawton, J.*

*John F. Palmer* for the defendant.

*Christopher Pohl,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Richard Rivera, fifteen years old on November 23, 1994, the date of the offense, was indicted for murder. On transfer hearing the Juvenile Court retained jurisdiction over

him.[1] At a bench trial in Juvenile Court he was found delinquent as guilty of murder in the first degree. On his appeal for trial de novo (as was then possible[2] ), he was tried to a jury in Juvenile Court and again found delinquent in the same sense. Appealing to our court, he now claims as errors the trial judge's allowance of the Commonwealth's peremptory challenges to two prospective jurors; submission to the jury of a theory of murder based on extreme atrocity or cruelty (in addition to a theory of deliberate premeditation); and certain instructions to the jury on the issue of malice. There was no error and we shall affirm the judgment of delinquency.[3]

The evidence heard by the jury, all involving teenage actors, was the following in brief outline. In the afternoon of November 23, Adilson Pires was playing spot basketball with Emir Quintana, a friend, on the court adjacent to the John Winthrop Elementary School in the Dorchester section of Boston. Some kids showed up, including the defendant, known to Pires from prior encounters at the playground. The defendant walked up to Quintana on the basketball court, and at a distance between them of a few feet, the two exchanged words about an earlier fight between Quintana and the defendant's cousin. At this point, Lafayette Benson appeared, a friend of the defendant. Benson knew the defendant was carrying a handgun; moments before he had seen Damion Gouse pass a gun to the defendant. Now Benson grabbed the defendant from behind and led him away and down a flight of stairs to a lower level of the playground. Benson took the gun from the defendant, held it a while, and returned it on the condition the defendant would leave the area. During the same interval Pires was advising Quintana to leave the court. Quintana remained, dribbling a ball.

Some five minutes after his first show up, the defendant

---

[1]The ruling was affirmed by our court, *Commonwealth* v. *Ken K.*, 42 Mass. App. Ct. 1125 (1997).

[2]By the 1996 revision statute, trial de novo was eliminated, see G. L. c. 119, § 56, as amended by St. 1996, c. 200, § 4, and jurisdiction was transferred from Juvenile Court to Superior Court over juveniles charged with murder committed when they were between fourteen and seventeen years of age. See G. L. c. 119, § 74, as amended by St. 1996, c. 200, § 15.

[3]The defendant was sentenced to a term of twenty years for his conviction of murder in the first degree, to be committed to the Department of Youth Services until age twenty-one, then transferred to the Department of Correction to serve the balance of his term.

returned to the basketball court, headed toward Quintana, and said, "My boys ain't holding me back no more." Standing there, without stepping forward, Quintana put up his hands, presumably in a stance to fight. The defendant drew a gun from his pocket, pointed it at Quintana, and fired one shot. He was no more than twelve feet from the victim. Struck, Quintana tried to run across the court but collapsed to the ground. The defendant ran to the other end of the court, spoke a word to another boy, and fled the court and playground area.

About 4:20 P.M., Boston police Officer Raymond Ramirez on radio call reached the court and found Quintana "laying flat on his face," unconscious, "gasping for air." Turned on his back, the victim showed a wound with heavy blood loss at the left chest.[4] The officer performed CPR. The victim died on the scene.

The morning of November 29, after having interviewed Pires and Benson, Sergeant Detective Paul Barnicle secured an arrest warrant for the defendant. That afternoon Barnicle and another officer found the defendant and his mother at their home on Edgewood Street, Roxbury. At a police station, they gave statements. The defendant said (the tape recording was played to the jury) he had intended, in first approaching Quintana, to fight him "up and up," but Damion Gouse pulled him back, while others were restraining Quintana. Damion had given him a gun and said, "Do what you have to do." When the defendant returned to the court, he "didn't want to do it, [b]ut . . . just started talking to him, [p]ointed it [at] him and it just went off."[5] On November 30, Detective Barnicle spoke with Damion Gouse about the gun used in the shooting. Damion directed Barnicle to an empty apartment on Hammond Street, Roxbury, where he found a silver chrome .25 calibre Lorson semi-automatic handgun (and three rounds of suitable ammunition). Testing of the gun and comparisons with the bullet recovered from the victim's body and a spent shell casing found on the scene established that the Lorson was the fatal weapon.

1. *Peremptory challenges.* One prospective juror said at voir dire, "I guess I'm not the type of person that could really pass

---

[4]Dr. Leonard Atkins, a medical examiner for the Commonwealth, testified at trial that the gunshot passed through the left front of the chest in a slightly downward course and perforated the heart and aorta.

[5]The judge heard testimony on voir dire just before trial on which he ruled that the defendant gave his police statement voluntarily. The defendant does not attack the ruling.

judgment."[6] A second juror, thinking he recognized the defendant, who was present at the voir dire, asked him whether he came from Mattapan; the defendant answered no. The judge accepted these persons to serve as jurors. The prosecutor challenged them peremptorily — two of the prosecution's seven initial peremptory challenges. Defense counsel noted these persons were "the only young black males in the entire venire." In allowing the challenges, the judge said:

> "I remember during the individual voir dire I knew that there was justification for me at that time to excuse them. I also feel comfortable that they can remain fair and impartial, but I can see a rational basis for the Commonwealth exercising their [per]emptories against those two individuals. Put your objection on the record."

There was no "pattern" here of challenges to members of the same discrete group as the defendant, as pictured in *Commonwealth* v. *Soares*, 377 Mass. 461, 490, cert. denied, 444 U.S. 881 (1979), but a challenge to the only member could in given conditions be constitutionally prohibited. See *Commonwealth* v. *Harris*, 409 Mass. 461, 466 (1991); *Commonwealth* v. *Fryar*, 414 Mass. 732, 738 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997).

The judge evidently did not sense any such tendentious condition and thought the prosecutor acted without bias. The circumstances do not appear suspicious. We are not well

---

[6]The judge's colloquy with the juror continued, in part:

COURT: "Well, if you believe you could be a fair and impartial juror, you would have to vote yea or nay."

JUROR: "That would be kind of hard."

COURT: "You'd have to vote on guilt or innocence. You don't believe you could do that?"

JUROR: "No."

. . .

COURT: "Is there any religious reason why you couldn't do it?"

JUROR: "No, not really. It's just that I just don't like to judge, you know, people."

informed about the composition of the venire.[7] Accepting that the challenges were to the only young black males in the venire,[8] we are not told about any older black males or black females of any age in the venire. In fact, we know one older black woman sat on the jury that tried the case.

The Commonwealth assumes in its brief — and the defendant in his brief does not dispute — that the victim Quintana was black. The Commonwealth observes that it works against an implication of prejudice from the allowance of the peremptories that the defendant is also black. Here is a demonstration of "the fluidity and sheer unnaturalness of racial identity"[9]: the victim was Hispanic — so observed and testified to by Officer Ramirez in a seemingly overlooked part of the record; also so stated in the victim's death certificate.[10] A person referred to as Hispanic sat on the jury that tried the case. Consult *Commonwealth* v. *Calderon*, 431 Mass. 21, 25 n.2 (2000).

It is regrettable, but not reversible, that the judge did not follow the procedure described in *Commonwealth* v. *Burnett*, 418 Mass. 769, 770-771 (1994). He should have made an explicit finding whether in his view a prima facie case of unlawful discrimination had been shown. *Id.* at 771. If so, the burden would shift to the Commonwealth to provide a class-neutral reason for the challenges. Because the judge did not follow the set procedure, we are obliged to, and have examined the validity of the challenges on a de novo basis, see *Commonwealth* v. *Calderon*, 431 Mass. at 28. We conclude that the challenges should stand, even if we were to give no weight to the presumption of correctness that ordinarily attends the actions of the prosecution in jury selection. See *Commonwealth* v. *Burnett, supra* at 770. See also *Commonwealth* v. *Calderon, supra* at 25-26 n.2.

---

[7]We can piece together that the venire had some seventy prospective jurors at the outset; that twenty-three were excused for cause; the Commonwealth exercised nine peremptory challenges, and the defense ten. That the makeup of the entire venire figures in considering whether there has been a prima facie showing of impropriety, see *Commonwealth* v. *Green*, 420 Mass. 771, 777 (1995); *Commonwealth* v. *LeClair*, 429 Mass. 313, 319 (1999).

[8]Youth itself would not be a proper basis for objection to peremptory challenges. See *Commonwealth* v. *Samuel*, 398 Mass. 93, 95 (1986) ("There is no constitutional basis for challenging the exclusion of young persons"); *United States* v. *Cresta*, 825 F.2d 538, 545 (1st Cir. 1987), cert. denied sub nom. *Impemba* v. *United States*, 486 U.S. 1042 (1988).

[9]Orlando Patterson, in N.Y. Times Book Review, Oct. 22, 2000.

[10]The death certificate also listed the victim's "race" as "White."

2. *Theory of extreme atrocity.* The judge submitted to the jury a verdict slip by which the jury found the defendant guilty of first degree murder, and then, on separate lines, guilty by deliberate premeditation and by extreme atrocity or cruelty. The second theory had not figured in the bench trial or been mentioned in the Commonwealth's opening speech to the jury; its later emergence in the case might well have startled defense counsel. Murder by a single gunshot wound does not easily qualify as extreme atrocity or cruelty in the meaning of the statute. See *Commonwealth* v. *Blackwell,* 422 Mass. 294, 299-300 (1996). If, for insufficiency of supporting evidence, it was error to put the theory to the jury, the defendant's conviction would not be shaken, for the error would not infect the guilty finding on the separate theory of deliberate premeditation. See *Commonwealth* v. *Cruz,* 424 Mass. 207, 209 (1997). See also *Commonwealth* v. *Glass,* 401 Mass. 799, 802 n.2 (1988); *Commonwealth* v. *Chipman,* 418 Mass. 262, 270 n.5 (1994).[11]

3. *Instructions.* There is no dispute that the judge's main instructions defining deliberate premeditation and malice (together describing murder in the first degree) were fair and accurate; indeed, the instructions were consistent with the Model Jury Instructions on Homicide whose adoption by the Supreme Judicial Court postdated the instant trial. So also the judge gave proper instructions on the subject of the making of inferences, which suggested that in differing conditions of the facts inferences may be strong or weak, with varying degrees of probability or convincingness. The jury were further instructed on the Commonwealth's ultimate burden of proof.

In this setting, on the periphery of the basic instructions, the judge said:

> "In considering whether Mr. Rivera acted with the state of mind that I have described as malice aforethought, you may draw reasonable inferences from the evidence. You may infer an intent to cause death from, among other things, the condition of the victim's body. In addition, you may also infer that a person intends the natur[al] and prob-

---

[11]As the result of the appeal is not affected by the elision of the theory of extreme cruelty, we need not comment on the Commonwealth's reconstruction that the defendant purposefully made the victim aware he was about to be killed and then killed him in execution style while the victim's hands were in the air.

able consequences of an act that is knowingly and voluntarily done."

The defendant argues that the judge by these words qualified or weakened the concept of malice, and thus prejudiced the jury's consideration of his statement that he acted without specific intent to kill and the gun "just went off."

*a.* The case law justifies the use in the judge's discretion of the quoted instruction which permits a jury to make the predicated inference from condition of the body with probability high, low, or indifferent, as appropriate to the facts. "The intent to inflict an injury may be inferred from, among other things, the condition of the [victim's] body . . . ." *Commonwealth* v. *Nadworny*, 396 Mass. 342, 358 (1985), cert. denied, 477 U.S. 904 (1986). Again in *Commonwealth* v. *Vazquez*, 419 Mass. 350, 354 (1995), the court ruled that a photograph portraying the injuries inflicted might properly be considered by the jury in relation to murder by deliberate premeditation (as well as by extreme atrocity or cruelty). See *Commonwealth* v. *Amazeen*, 375 Mass. 73, 80-81 (1978); *Commonwealth* v. *Harvey*, 397 Mass. 803, 810 (1986).[12]

*b.* It is error to instruct that "[the] law presumes that a person intends the ordinary consequences of his voluntary acts," *Sandstrom* v. *Montana*, 442 U.S. 510, 513, 524 (1979) — to allow such a conclusive or burden-shifting presumption would deprive a defendant of due process. In line with *Sandstrom*, the court said in *Commonwealth* v. *Callahan*, 380 Mass. 821, 825 (1980), quoting from *Commonwealth* v. *Collins*, 374 Mass. 596, 600 n.2 (1978), the " 'traditional instruction that a person may be held to intend the natural and probable consequences of his conduct' must not be phrased so as to establish a presumption in favor of the Commonwealth which the defendant must overcome." The particular language used is to be seen in the context of the entire charge, and "error is avoided if the charge, read as a whole, makes clear the Commonwealth's burden." *Commonwealth* v. *Repoza*, 382 Mass. 119, 134 (1980), quoting from *Commonwealth* v. *Medina*, 380 Mass. 565, 578 (1980). In the

---

[12]While the judge did not charge on the point, a fact finder might infer malice perhaps with high probability from a defendant's bringing a gun to the site and intentionally firing it at the victim standing defenseless. Compare *Commonwealth* v. *Stewart*, 398 Mass. 535, 541 (1986); *Commonwealth* v. *Robertson*, 408 Mass. 747, 757 (1990); *Commonwealth* v. *Cohen*, 412 Mass. 375, 379 (1992).

present case, the term presumption did not appear, rather reasonable inference was invoked; as noted, the charge insisted repeatedly on the Commonwealth's burden, and the judge brought the point home when, in response to a question from the jury, he said, "Malice, as it applies to deliberately premeditated murder, means specific intent to cause death. The intent required here is the intent to cause death. The Commonwealth must prove that the defendant Mr. Rivera actually had in his mind that he wanted to cause the death of the decedent."[13]

*Judgment affirmed.*

---

[13]See *Commonwealth* v. *Chasson*, 383 Mass. 183, 192-193 (1981); *Commonwealth* v. *Doucette*, 391 Mass. 443, 450-452 (1984); *Commonwealth* v. *Hicks, ante* 215, 219 (2000). For contrasting cases, where the jury instruction suggested a presumption, see *Commonwealth* v. *Callahan, supra* at 822 & n.1; *DeJoinville* v. *Commonwealth*, 381 Mass. 246, 247, 252-254 (1980); *Commonwealth* v. *Palmer*, 386 Mass. 35, 36-38 (1982); *Commonwealth* v. *Sires*, 405 Mass. 598, 599-600 (1989).