Donnell JOHNSON, Plaintiff,
Appellant,

v.

William MAHONEY, Daniel Keeler,
Defendants, Appellees,

The City of Boston and Paul
F. Evans, Defendants.

No. 04–1745.

United States Court of Appeals,
First Circuit.

Heard March 10, 2005.

Decided Sept. 20, 2005.

Order Denying Rehearing Nov. 14, 2005.

See also *Commonwealth v. Kent K.*, 427
Mass 754, 696 N.E.2d 511.

Wendy Sibbison for appellant.

James W. Simpson Jr. with whom Douglas I. Louison and Merrick, Louison & Costello, LLP were on brief for appellee, William Mahoney.

John P. Roache, Esq. with whom Hogan, Roache & Malone was on brief for appellee, Daniel Keeler.

Before BOUDIN, Chief Judge, CAMPBELL, Senior Circuit Judge, and HOWARD, Circuit Judge.

CAMPBELL, Senior Circuit Judge.

Convicted after a jury trial in the Massachusetts Juvenile Court of first degree murder and related offenses, Donnell Johnson was sentenced to 18 to 20 years for the fatal shooting of a nine-year-old boy in the Roxbury neighborhood of Boston, Massachusetts. He appealed unsuccessfully to the Massachusetts Supreme Judicial Court ("SJC"). Five years into Johnson's sentence, the District Attorney nolle prossed Johnson's convictions in light of new evidence exonerating him, and Johnson was released.

Johnson subsequently brought a complaint in the United States District Court for the District of Massachusetts against the City of Boston; the Boston Police Commissioner; and three Boston police officers, William Mahoney, Daniel Keeler, and James Doyle, for violation of 42 U.S.C. § 1983 (Count I), violation of § 1983 by conspiracy (Count II), and violation of Mass. Gen. Laws ch. 12, § 11I (Count III). Johnson alleged that Defendants–Appellees Mahoney and Keeler had violated his constitutional rights by, *inter alia*, withholding allegedly exculpatory evidence— police reports summarizing statements made by Johnson and his mother to the police to the effect that he was at home when the shooting had occurred. Mahoney and Keeler moved separately for summary judgment on all counts, and the district court granted their motions. Johnson appeals from the judgment in favor of Mahoney on Counts I and II. Johnson also appeals from the judgment favoring Keeler on Count II.[1] We affirm the judgment of the district court.

---

**1.** Johnson does not appeal from the judgment in favor of either Mahoney or Keeler on

Count III. Claims against the City of Boston, the Boston Police Commissioner, and Doyle

## I. Background

The facts are recited in the light most favorable to Johnson. *See Ingram v. Brink's, Inc.*, 414 F.3d 222, 228 (1st Cir. 2005). On the night of October 31, 1994, two men shot at a group of people at a housing project in the Roxbury neighborhood of Boston. Jermaine Goffigan, who celebrated his ninth birthday that day, was hit and died from his wounds several hours later. The investigation was conducted by the Homicide Unit of the Boston Police Department. Mahoney supervised the investigation, and Keeler was one of the detectives who worked on the investigation.

On November 1, 1994, based on eyewitness identifications, Johnson, then sixteen years old, was arrested in connection with the incident. Keeler informed Johnson and his parents of Johnson's Miranda rights. Both Johnson and his parents initialed and signed a Miranda form, acknowledging their understanding of Johnson's Miranda rights and agreeing to have Johnson talk with police without a lawyer being present. Keeler interrogated Johnson in the presence of his parents, and informed him that he was under arrest for murder and was accused of shooting Goffigan. Johnson responded that he was home on the night of the shooting, and

remained there all evening. He said he spent the evening in his room, watching television and talking to friends on the phone. Keeler also interviewed Johnson's mother. She stated that her son had been home all evening the night of the incident with her, his grandmother, and his sister.[2] Shortly thereafter, Keeler prepared reports summarizing his interviews of Johnson and his mother, and he gave the reports to Mahoney.

At the time of Johnson's arrest, Massachusetts law afforded a juvenile defendant a first-instance bench-trial in the juvenile court. If not acquitted by the juvenile court judge, the juvenile could elect a *de novo* jury trial in the same court. *See Patrick P. v. Commonwealth*, 421 Mass. 186, 655 N.E.2d 377, 378–81 (1995).[3]

Between the time of Johnson's November 1994 arrest and his March 1996 bench trial, defense counsel repeatedly requested the prosecutor to produce statements to the police made by Johnson and his mother. Each time, the prosecutor responded that there were no such statements.[4]

Mahoney, when called as a defense witness at the bench trial, testified that he took no statements from Johnson relating to the incident.

were dismissed by stipulation prior to this appeal.

**2.** Johnson's mother testified similarly before the grand jury, and her testimony was made available to the defense prior to the bench trial. Counsel acknowledged knowing her story "all along." Johnson's complaint concerning withholding of the police reports thus focuses on his own statement, not hers.

**3.** In 1996, the optional trial *de novo* was abolished in Massachusetts for juveniles. *See* Mass. Gen. Laws ch. 119, § 56, as amended by St.1996, ch. 200, § 4; *Commonwealth v. Rivera*, 50 Mass.App.Ct. 532, 739 N.E.2d 278, 280 n. 2 (2000).

**4.** The prosecutor had given defense counsel a copy of one statement—a report recounting statements made by Johnson at the time of his arrest. After being placed under arrest at his grandmother's house, Johnson yelled to his grandmother, "[T]hey ain't got shit on me." The report also noted that, later at the police station, Johnson stated to police, "You got nothing on me. I'll be in school in a couple of days rapping with the bitches." Defense counsel, however, insisted that there were additional statements taken during the post-Miranda interviews.

Q [Defense Counsel]. Was a statement taken from the defendant?

A [Mahoney]. No, I don't believe there was.

Q. He waived his rights, didn't he?

A. Yes. Yes—well, he did and he didn't, sir. That's—

Q. Well, there's a waiver form that was signed.

A. That's correct. Correct, sir.

. . .

Q. And [Johnson] then proceeded to tell you that he didn't commit the crime, didn't he?

A. That's incorrect.

Q. Well, was any statement taken from him?

A. No.

Q. Nothing was written down?

A. Nothing was taken.

Q. Well, what happened after [the waiver form] was signed?

A. Mrs. Johnson was the co-signee of that, and she refused to allow us to question the boy.

Q. After it was signed?

A. Yes.

Q. So you have absolutely no statements from the Defendant relative to that incident?

A. That's correct.

Keeler did not testify at the bench trial nor did the defense request that he be made available to testify.

Johnson presented ten witnesses at the bench trial. Six of these witnesses later testified on behalf of the Commonwealth at the subsequent jury trial. Neither Johnson nor his mother testified at the bench trial, nor was any evidence presented at the trial as to Johnson's earlier assertion to Keeler that he had been in his room at home at the time of the shooting.

The Commonwealth presented eight witnesses, including three eyewitnesses to the shootings. The eyewitnesses—the victim's mother, the victim's brother, and a family friend—each testified that one of the assailants was, like Johnson, a light-skinned male with freckles. The eyewitnesses did not know Johnson prior to the incident. They testified they identified Johnson as being one of the two gunmen in a photographic array shortly after the incident and in a subsequent line-up.[5] Each of them then made an in-court identification of Johnson as the light-skinned gunman. The victim's mother testified that there was "[v]ery bright" lighting at the scene of the shooting, including street lights on the street from which the assailants shot. The victim's brother also testified that there was a street light near the scene. Defense counsel, on the other hand, elicited testimony from several witnesses that the lighting in the area was "[d]im" and not good.

The juvenile court judge adjudicated Johnson to be a delinquent offender by reason of first degree murder, assault and battery by means of a dangerous weapon, armed assault with intent to murder, and possession of a firearm.

After the bench trial, Johnson claimed his right to a *de novo* jury trial. Johnson filed a motion for discovery of Johnson's statement to Keeler. Johnson's counsel informed the prosecutor that Johnson and his parents said they had been interviewed and that the interviews had been tape recorded. The prosecutor stated that he had no such statements. The prosecutor spoke to Mahoney who indicated that there were no statements and no tapes.

5. A fourth eyewitness, the victim's grandmother, was called by the defense and testified that she could not positively identify anyone in the photographic array or the line-up.

The prosecutor also spoke to Keeler who said he would review his computer disks for statements.

The case proceeded to trial before a jury on November 18, 1996. The Commonwealth presented in its case-in-chief fifteen witnesses, including the three eyewitnesses who testified at the bench trial. The eyewitnesses each testified that they identified Johnson as one of the assailants in a photographic array and in a subsequent line-up, and then made an in-court identification of Johnson.

On November 21, the day before the Commonwealth rested its case, Keeler faxed the reports summarizing the statements of Johnson and his mother to the prosecutor. The prosecutor then immediately faxed the statements to Johnson's counsel. The following morning, the prosecutor discussed the late disclosure of the statements with Keeler and Mahoney. The prosecutor described this conversation during a deposition in the instant action:

[Mahoney and Keeler] knew that [Johnson's counsel] was going to call them as witnesses, and I explained to both of them that they were going to have to explain how the statement was turned over at this stage, at this late stage. Sergeant Keeler said to Sergeant Mahoney, "Just say that it was inadvertent." I then said to Sergeant Keeler that Sergeant Mahoney is going to have to explain how in the transcript of the bench trial he said that there was no statement, that the defendant made no statement. Sergeant Mahoney—Sergeant Keeler said words to the effect, "I'm not going to take the fall for this."

The defense moved to dismiss the indictments because of the earlier failure to produce the reports containing the statements. While the judge who presided at the jury trial stated that "[he] certainly [did] not approve of the failure to disclose

discovery agreed to and mandatory in the case," he denied the motion to dismiss the indictments on the ground that Johnson was not "prejudiced to any degree." The defense then moved for a mistrial, which the court also denied.

Both Mahoney and Keeler were called as witnesses at the jury trial. When questioned about the late disclosure of the statements, Mahoney and Keeler testified that the prosecutor had asked only for "taped" statements. Keeler testified as follows:

Q [Defense counsel]. When did you first turn these statements over to anyone?

A [Keeler]. I believe I made the reports out by the third, right around the second, there, and submitted them shortly afterwards.

Q. Who did you submit them to?

A. I would funnel them through Sergeant Mahoney.

Q. Are you sure you funneled them to him?

A. I believe so.

Q. Were you inquired of in recent weeks as to whether you had any statements?

A. The specificity of the statements, sir, that I was inquired of was taped statements.

Q. No one asked you whether there were any statements?

A. Taped statements, sir.

Q. No one asked you whether there were any statements?

A. Once again, taped statements, sir.

Q. And you did tape this statement, didn't you?

A. Absolutely not.

Mahoney testified on cross-examination: "[W]hen the District Attorney asked me for what I had, I gave him everything I

had." Defense counsel asked Mahoney about his testimony in the bench trial that there were no statements from Johnson about the incident. Mahoney said it was his recollection that "at that time [he] was asked about taped statements ... and [his] answers were there were no statements taken, because it was [his] belief and [his] understanding that the question was relative to taped statements."

The defense presented fourteen witnesses at the jury trial, including Johnson, his mother, and his grandmother. The latter three testified that Johnson had been home the evening of the shooting with his mother, grandmother, and sister. The mother and grandmother testified that the apartment was small and had a heavy door with a deadbolt lock and that they would have seen and heard Johnson had he left the apartment that night. Johnson testified that, the day after the incident, another individual confessed to him to having been responsible for the shooting. He said he did not tell police this information at the time of his arrest because he feared he would be killed if he identified the responsible party.

The jury found Johnson to be delinquent by reason of first degree murder and related offenses, and Johnson was sentenced to 18 to 20 years. Johnson appealed from the delinquency adjudication to the SJC. On July 7, 1998, the SJC affirmed the adjudication, ruling that the failure to turn over the police reports summarizing the statements when originally requested did not prejudice Johnson. *Commonwealth v. Kent K.*, 427 Mass. 754, 696 N.E.2d 511, 515 (1998). The SJC stated in its opinion:

> The Commonwealth concedes, and we emphasize, that such discovery should have been provided the juvenile when originally requested. In the face of repeated requests by counsel for specific and identified information, there should be no room in the criminal justice system for such carelessness—if that is what it was. The question, however, is whether the juvenile suffered prejudice as a result of the Commonwealth's inaction. He did not.

*Id.* (footnote omitted).

The SJC went on to reason that Johnson's statement "contains only a generic denial of the accusations against him, which is inadmissible evidence ... and hearsay evidence ... that would not have helped [Johnson] at his bench trial or at his trial by jury." *Id.* (citation omitted). The SJC also rejected Johnson's argument that the "knowledge of the police report would have bolstered defense counsel's opening statement by permitting reference to [Johnson's] willingness to talk to the police immediately after the shooting." *Id.* The SJC reasoned that this argument was unpersuasive "because defense counsel may not allude in his opening statement to evidence that he does not reasonably believe in good faith may be adduced during the trial." *Id.*

In 2000, new evidence was discovered exonerating Johnson. His convictions were thereupon nolle prossed and Johnson was released. Johnson subsequently brought the present action in the Massachusetts federal district court, alleging violations of 42 U.S.C. § 1983 (Counts I & II) and Mass. Gen. Laws ch. 12, § 11I (Count III). Johnson alleged that Mahoney and Keeler deprived him of his constitutional rights by withholding exculpatory evidence and by interfering with his counsel's ability to decide whether to present certain witnesses, including Johnson himself. *See Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Johnson further al-

leged that Mahoney committed perjury at the bench trial by denying the existence of the exculpatory evidence. Johnson alleged that his defense would have been stronger had he received the statements in a timely fashion. He claimed he would have taken the stand at his bench trial, but was unable to do so because of the risk of being subjected to impeachment by the prior statement that could have surfaced during cross-examination.

Mahoney and Keeler moved for summary judgment on all counts, which the district court granted. The court reasoned:

> Although the bench trial may have been tainted by the failure to disclose Johnson's statement, Johnson received an impartial *de novo* jury trial after his bench trial.... Any errors at the bench trial, "even if of constitutional magnitude, do not survive as a basis for complaint once the case has moved to the second tier," trial *de novo* before a jury.

*Johnson v. Mahoney,* No. 02–CV–10730–MEL, at 6–7 (D.Mass. Apr.26, 2004) (memorandum and order granting summary judgment) (quoting *Commonwealth v. Higgins,* 23 Mass.App.Ct. 552, 503 N.E.2d 1326, 1329 (1987)). The district court noted that Johnson testified in his own defense at the jury trial, as did his mother and grandmother, and his counsel cross-examined Mahoney and Keeler at length about the late disclosure of the statement. *Id.* at 7, 503 N.E.2d 1326.

Johnson appeals from the district court's order granting summary judgment in favor of Mahoney on Count I, alleging individual liability, and on Count II, alleging a conspiracy between Mahoney and Keeler. Johnson also appeals from the judgment in favor of Keeler on Count II.

## II. Discussion

We review an order granting summary judgment *de novo. Cox v. Hainey,* 391 F.3d 25, 28–29 (1st Cir.2004). In doing so, we draw all reasonable inferences from the record in the nonmovant's favor, in this case, Johnson. *Id.* at 29.

### A. Violation of § 1983 (Count I)

To defeat summary judgment in favor of Mahoney on Count I, Johnson must present evidence sufficient to create a genuine issue of material fact as to Mahoney's liability under § 1983. To establish a violation of 42 U.S.C. § 1983, a plaintiff must show by a preponderance of the evidence that: (1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States. *Soto v. Flores,* 103 F.3d 1056, 1061–62 (1st Cir.1997); *Tatro v. Kervin,* 41 F.3d 9, 14 (1st Cir.1994).

Mahoney does not contest Johnson's allegation that, at all relevant times, he was on duty and acting under color of state law. The second element requires that Johnson establish that Mahoney's conduct was a cause of the alleged deprivation of rights secured by the Constitution or federal laws. *See Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 831 (1st Cir.1987) ("Section 1983 imposes a causation requirement similar to that of ordinary tort law.").

*1. Whether the jury trial cured any errors affecting the earlier bench trial*

Mahoney argues that his conduct was not the cause of the alleged deprivation because, as the district court held, Johnson's *de novo* jury trial cured any errors in the bench trial. Under Massachusetts' now-abandoned two-tier system, "[a] de-

fendant's choice to have a bench trial in the first instance, without any prospect of review of errors occurring in the course of that trial, means that a considerable variety of errors might occur from which he could not obtain any relief." *Lydon v. Commonwealth*, 381 Mass. 356, 409 N.E.2d 745, 750 (1980). Prosecutorial misconduct is one such error. *Id.* "First-tier errors, 'even if of constitutional magnitude,' do not survive as a basis for complaint once the case has moved to the second tier." *Higgins*, 503 N.E.2d at 1329. In other words, "[a]ny errors which may have contaminated the bench trial were effectively expunged by the availability of a de novo trial in the District Court jury-of-six session." *Foley v. Lowell Div. of the Dist. Court Dep't of the Trial Court*, 398 Mass. 800, 501 N.E.2d 1151, 1153 (1986).

The United States Supreme Court relied on similar reasoning in *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984). There, the Supreme Court held that it was not a violation of the double jeopardy clause to require a defendant to go through a *de novo* jury trial, even when the evidence at the bench trial was allegedly insufficient to warrant a conviction. *Id.* at 310, 104 S.Ct. 1805. The Court based its decision on the principle that "[o]nce the right to a de novo trial is exercised, the judgment at the bench trial is 'wiped out.'" *Id.* (citing *Mann v. Commonwealth*, 359 Mass. 661, 271 N.E.2d 331 (1971)). *See also id.* (not-

ing that "virtually nothing can happen to a defendant at a first-tier trial that he cannot avoid" by exercising his right to a de novo jury trial).

Here, the district court held that any error arising from the non-disclosure of Johnson's statement at the bench trial did not survive at the *de novo* jury trial, because Johnson received the statements, cross-examined Mahoney and Keeler about the late disclosure of the statements, and testified in his own defense. Johnson argues, however, that, while a *de novo* jury trial cures errors for purposes of the *criminal* process, it does not rule out a *civil* claim against a state actor under § 1983. *Cf. Heck v. Humphrey*, 512 U.S. 477, 483, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (noting that section 1983 "creates a species of tort liability" in favor of persons deprived of constitutional rights).[6] The parties have not cited nor are we aware of any case addressing whether the *de novo* jury trial cures any errors in an initial bench trial for purposes of a civil rights claim. Given the absence of precedent, state or federal, we prefer to rest our decision on the alternate grounds discussed below— namely, the absence of prejudice and the collateral estoppel effect of the SJC's ruling of no prejudice. *See Uncle Henry's, Inc. v. Plaut Consulting Co.*, 399 F.3d 33, 41 (1st Cir.2005) ("We may affirm a summary judgment decision on any basis apparent in the record.").

---

**6.** Relying on *Commonwealth v. Light*, Johnson also argues that a *Brady* error at a bench trial is not cured by a *de novo* trial. *See* 394 Mass. 112, 474 N.E.2d 1074 (1985). In *Light*, the defendant was convicted of leaving the scene of a motor vehicle collision without giving information required by statute. The charge arose from an alleged collision between a motor vehicle operated by the defendant and a police cruiser. *Id.* at 1075. The Commonwealth withheld evidence from defendant's bench trial that a chemist had found that

paint chips on the police cruiser did not match paint chips on the defendant's vehicle. The SJC found that the evidence was "material, exculpatory evidence known to the police, which might well have ended the case with a finding of not guilty." *Id.* at 1076. The SJC ordered that the defendant be allowed the option of a new bench trial, rejecting the Commonwealth's argument that the remedy for prosecutorial misconduct at a bench trial is a *de novo* jury trial. *Id.* at 1076-77.

2. *Whether Johnson's statement in the withheld police report, and Mahoney's erroneous testimony, caused prejudice to Johnson*

Johnson's claims of constitutional deprivation under § 1983 are premised on the theory that the withheld police report describing his statement was exculpatory and that, also, its non-production interfered with his counsel's ability to choose a proper defense strategy—in particular whether to call Johnson, his mother and grandmother as witnesses to testify concerning Johnson's alibi. *See Rock,* 483 U.S. at 52, 107 S.Ct. 2704; *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052; *Brady,* 373 U.S. at 87, 83 S.Ct. 1194.

An element necessary to making out a constitutional violation of this nature is that the withheld evidence was not only exculpatory but that its withholding resulted in prejudice. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (holding that, to prove a *Brady* claim, a defendant must show that the violation resulted in prejudice to the defendant so serious that there is "a reasonable probability that the suppressed evidence would have produced a different verdict"); *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").[7]

As further discussed in section 3 below, the SJC found that withholding the statement, while improper and reprehensible, was not prejudicial to Johnson in his bench trial. Pragmatic support for the lack of prejudice lies in Johnson's conviction by the jury in the second trial even though, by then, the withheld police report had been turned over to the defense, and Johnson, his mother and his grandmother had all testified that Johnson was in his room at home on the night of the shooting. While Johnson's second conviction does not preclude the possibility that a different fact finder might have reached a different verdict, it reinforces Mahoney's and Keeler's contentions that the effect of the withheld evidence was marginal.

Moreover, the alibi in the report was less than airtight. Johnson's statement says he was at home all evening, but he was in his own room, and the report notes that neither Johnson nor his mother "could provide [the police] with anyone that [Johnson] had · contact with after ten o'clock."[8] The report, in addition, contains detrimental material pointing to Johnson's likely involvement in other criminal episodes.[9]

Johnson argues that, if the report had been timely produced, it would have altered the conduct of the bench trial by causing Johnson's counsel to put Johnson and his mother on the witness stand to testify to his alibi of being at home. Even though inadmissible (as the SJC held) under Massachusetts evidentiary rules, it is

7. In *Strickland*-type cases, prejudice may be presumed in rare circumstances, *see Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), but we have held that "that is the exception, not the rule," *Ouber v. Guarino,* 293 F.3d 19, 25 (1st Cir. 2002). *See also Bell v. Cone,* 535 U.S. 685, 695–96, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (reiterating that prejudice may be presumed only in three narrow circumstances). This is not one of those rare situations.

8. The report summarizing Johnson's mother's statement is also less than airtight. The report notes that neither Johnson's mother nor his grandmother "could state that they ob-

served [Johnson] after approximately 10:10 P.M."· Johnson's mother told police that her son would have been unable to leave the apartment without her hearing him because the door was loud and she would have heard him if he had attempted to leave or enter. The report noted, however, that Keeler went to the apartment, "opened and closed the front door several times," and "found that there was no sound made by doing so, to the contrary the process was quite quiet, contradicting what [Johnson's mother] had stated during [the] interview."

9. The report of Johnson's mother's statement similarly contained material pointing to Johnson's involvement in other criminal incidents.

reasonable to suppose that, if the report had been available, the judge presiding in the bench trial would have learned of its contents. In such a trial the judge not only finds facts but rules on admissibility and so becomes aware of the contents of even inadmissible documents. Once having the report, or so it is argued, defense counsel—perhaps encouraged by the judge—would have felt obliged to call Johnson, his mother, and grandmother to the stand to confirm Johnson's statement therein that he was at home at the time of the shooting. Without knowing the contents of the report, Johnson argues, it was simply too risky for his counsel to present the alibi witnesses, since there was the risk that the government would impeach them with a report containing statements inconsistent with their testimony. And the report could have been used to impeach Mahoney's testimony to the effect that Johnson never denied committing the crime and had not cooperated with the police by making a statement. Of course, had the report been available, Mahoney would probably never have testified as he did—but the report would then have served a purpose helpful to Johnson by forestalling Mahoney's untrue and possibly deleterious testimony.

In any case, Johnson argues, whether the juvenile court judge would have acquitted him had the report been available so as possibly to alter the tenor of the bench trial is a question of fact that precludes the granting of summary judgment. Johnson contends a jury could find that the juvenile court judge, presented with the report and the alibi witnesses that its presence would have led counsel to call, was "reasonably likely to recognize that this was an innocent teenager who was telling the truth—a fact now settled as a matter of law."

■ Notwithstanding the above contentions, the withholding of the statement does not establish the necessary prejudice. As noted, Johnson's alibi was less than airtight (he might have slipped out of his bedroom), and his own testimony and that of his mother and grandmother were of questionable weight in the face of the positive eyewitness identifications, as the jury in the second trial seems to have found. Moreover, it is speculative that if the report had been produced, the strategy of the bench trial would have been changed. Regardless of the report, defense counsel already knew from Johnson's mother's grand jury testimony and from Johnson himself, of their available testimony that Johnson had been home, yet counsel elected not to call them to the stand. Defense counsel's purported fears about contradiction by the as yet unknown report seem greatly exaggerated. While the contents of any report were then unknown, Johnson and his mother knew and could tell his attorney what it was they had told the police. It was likely, as in fact occurred, that the report would deviate little if at all from this, in which case, had they chosen to testify, it would not be impeaching. And if for whatever reason the report had so differed from Johnson's and his mother's version as to be impeaching, it would probably have been excluded if offered by the prosecution for that purpose given the prosecution's previous false denials of its existence. Johnson's decision not to call the alibi witnesses in the bench trial seems more likely a tactical one, influenced not by the report's absence but by the view that the more important jury trial was yet to come and that it would be unwise to expose key defense witnesses to scrutiny at an early stage.

We are accordingly unpersuaded that a reasonable probability existed that the suppressed evidence would have produced a different result in the bench trial had it surfaced there. We shall go on to consider in the alternative, however, whether Johnson's cause of action is, in any event, barred by collateral estoppel. We hold that Johnson's cause is so barred.

### 3. Collateral Estoppel

We next turn to whether Johnson's

§ 1983 claims are, in any case, barred by the doctrine of collateral estoppel.[10] Mahoney and Keeler contend Johnson is attempting to re-litigate issues decided against him by the SJC in *Commonwealth v. Kent K.,* 427 Mass. 754, 696 N.E.2d 511 (1998).[11]

■ It is well-established that the doctrine of collateral estoppel applies in civil rights actions brought pursuant to 42 U.S.C. § 1983. *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Federal courts must give to state-court judgments the same preclusive effect as would be given by the courts of the state from which the judgments emerged. *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Allen,* 449 U.S. at 96, 101 S.Ct. 411.

Massachusetts courts apply the doctrine of collateral estoppel as it has been described in the Restatement (Second) of Judgments (1982). *Martin v. Ring,* 401 Mass. 59, 514 N.E.2d 663, 664 (1987). Section 27 of the Restatement provides that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." Restatement (Second) of Judgments § 27 (1982).

■ As applied in the present context, Massachusetts courts have abandoned the

requirement of mutuality. *See Aetna Cas. & Sur. Co. v. Niziolek,* 395 Mass. 737, 481 N.E.2d 1356, 1360 (1985) ("[A] party to a civil action against a former criminal defendant may invoke the doctrine of collateral estoppel to preclude the criminal defendant from relitigating an issue decided in the criminal prosecution."). "The guiding principle in determining whether to allow defensive use of collateral estoppel is whether the party against whom it is asserted 'lacked full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue.'" *Martin,* 514 N.E.2d at 665 (quoting *Fidler v. E.M. Parker Co.,* 394 Mass. 534, 476 N.E.2d 595, 600 (1985)).

The district court rejected a collateral estoppel argument raised by two defendants dismissed earlier in the case:

> The defendants' claim preclusion argument [was] without merit ... because it ignores the stark differences between the criminal appeal and this civil action. Johnson's state court proceedings dealt with the proposition whether Johnson's conviction was valid; the present action deals with the proposition that defendants violated Johnson's constitutional rights. Accordingly, the issues raised in Johnson's instant complaint have not been litigated in the state court.
>
> *Johnson v. Mahoney,* 223 F.Supp.2d 357, 359 (D.Mass.2002) (memorandum and order denying motions to dismiss).

**10.** Mahoney and Keeler assert, in a heading, that Johnson's § 1983 claims are barred by "Res Judicata and/or Collateral Estoppel," but the text that follows discusses collateral estoppel without any analysis of res judicata in its merger and bar aspect. To the extent defendants were attempting to argue that Johnson's claims are barred by the doctrine of res judicata, the argument is waived. *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

**11.** Johnson argues that the report discussed by the SJC is not the suppressed report at

issue here. The SJC asserts in *Kent K.* that Johnson's statement included a statement that another individual admitted shooting the victim. 696 N.E.2d at 515. Neither of the reports summarizing the interviews of Johnson and his mother include such a statement. Nevertheless, we see nothing in the record to suggest that the SJC was not considering the same statement by Johnson, which it indicated was not disclosed until the middle of the jury trial. No other police report has been called to our attention. Quite possibly the SJC merely misspoke when it indicated that the report included Johnson's statement made in the second trial about another individual.

We are unable to agree with the above reasoning that Johnson's § 1983 claims would not be precluded here by collateral estoppel because of the difference between the criminal case reviewed by the SJC and the present civil action. Massachusetts courts have repeatedly applied the doctrine of collateral estoppel even though the second action involved a different type of claim from the first. *See, e.g., Alba v. Raytheon Co.*, 441 Mass. 836, 809 N.E.2d 516, 521–23 (2004) (claims brought in workers' compensation action and discrimination action were identical for collateral estoppel purposes); *Green v. Town of Brookline*, 53 Mass.App.Ct. 120, 757 N.E.2d 731, 734–35 (2001) (rule of collateral estoppel barred relitigation of Civil Service Commission's finding, despite the fact that second action was based on the Workers' Compensation Act); *Martin*, 514 N.E.2d at 665 (finding on issue of causation in workmen's compensation proceeding could be given defensive collateral estoppel effect in negligence action brought by worker against home owner). And, as noted above, issues decided in criminal prosecutions may preclude their later relitigation in a civil action. *Niziolek*, 481 N.E.2d at 1360.

In the SJC, Johnson argued that he was prejudiced by the failure to disclose the report containing his statements until the middle of the jury trial. *See Kent K.*, 696 N.E.2d at 515. According to the SJC, he contended "that discovery of the police report would have aided him at the original bench trial." *Id.* at 515 n. 4. The SJC alluded to Johnson's arguments that knowledge of the statements would have permitted his counsel to refer in the opening statement of the bench trial to his willingness to talk to police, and would later have enabled his counsel to impeach Mahoney in that trial. *Id.* at 515 & n. 4.

The SJC dismissed these arguments because of its holding that "[t]he juvenile suffered no prejudice as a result of the Commonwealth's discovery error." *Id.* at 515. Before doing so, the SJC noted that "[t]he Commonwealth concedes, and we emphasize, that such discovery should have been provided." *Id.* The SJC went on to say, "In the face of repeated requests by counsel for specific and identified information, there should be no room in the criminal justice system for such carelessness—if that is what it was." *Id.* The SJC suggested that the incident involved "either serious misconduct or negligence." *Id.* n. 3. Having thus found both impermissible error and police misconduct or negligence, the SJC then characterized the dispositive question as being "whether [Johnson] suffered prejudice as a result of the Commonwealth's inaction." *Id.* at 515. The SJC found, "He did not," a conclusion it later repeated. *Id.* ("The juvenile therefore suffered no prejudice as a result of the Commonwealth's discovery error."). A primary reason given for its conclusion that Johnson suffered no prejudice was that Johnson's statement contained inadmissible and hearsay evidence. *See id.* Given the inadmissibility of the statements, the SJC believed that timely disclosure of the statements would not have bolstered defense counsel's opening statement or aided Johnson at the bench trial. *Id.* at 515 & n. 4. Additionally, the court thought it unlikely the "lead investigator" (Mahoney) would have testified as he did had the report been disclosed. *Id.* at 515 n. 4.

Johnson argues that the SJC only reviewed a state discovery violation. Because the court did not specifically refer to the federal constitution, he insists that its no-prejudice finding does not preclude the relitigation of prejudice as applied to his current claims, which are constitutional in nature.

■ The argument fails for at least two reasons. First, the SJC's finding of no prejudice relates to the impact of the wrongful withholding of the police report regardless whether that wrong is viewed as a constitutional violation or as a state law discovery violation. The prejudice the SJC sought to assess in *Kent K.* was whether the withholding of the report ma-

terially harmed Johnson's chances of prevailing at his bench trial. This is exactly the kind of prejudice that constitutes a necessary element of proof in the establishment of a constitutional violation under *Brady* and *Strickland. See Strickler,* 527 U.S. at 281–82, 119 S.Ct. 1936; *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. Thus regardless of the label attached to the police misconduct, the significant issue— whether there was resulting prejudice in fact—was adjudicated and decided adversely to Johnson by the SJC, precluding its relitigation now.

Second, even were it to be assumed that, for collateral estoppel purposes, it is necessary to tie the SJC's no-prejudice finding to recognition by that court that withholding the report had constitutional implications, there is good reason to infer such recognition by the SJC. Mahoney indicates in his appellate brief, and Johnson does not deny, that Johnson argued to the SJC that withholding of the report implicated his constitutional rights. And the SJC, in its opinion, as a premise to its no-prejudice finding, went out of its way to condemn the withholding of the report in strong terms more appropriate to a constitutional wrong than to a mere technical discovery error. In the circumstances, there is little reason to believe the SJC saw only some sort of technical discovery offense.

Johnson seeks to shore up his argument against collateral estoppel by citing the Supreme Court's language in *Allen v. McCurry* that an exception to collateral estoppel may arise "where state law did not provide for procedures for the litigation of constitutional claims, or where the state court failed even to acknowledge the existence of the constitutional principle on which a litigant based his claim." 449 U.S. at 101, 101 S.Ct. 411.

But we can see no indication either that Johnson was not afforded a fair procedure for litigating his constitutional claims,[12] or that the SJC "failed to even acknowledge the existence of the constitutional principle on which [he] based his claim." *Id.* To be sure, the SJC did not, in its opinion, specifically allude to *Brady, Strickland,* or any other federal constitutional case, but to do so would have been redundant given the Commonwealth's concession that the withholding had been wrongful, and given further the SJC's stated premise, that the prosecution had engaged in conduct "for which there should be no room in the the the criminal justice system." A lawyer or judge would have little doubt that malfeasance of the type described and condemned in the SJC's opinion raised federal constitutional as well as state law discovery concerns. The SJC nowhere implied that it took lightly or refused to recognize the constitutional principles undergirding plaintiff's claim. To the contrary, the court acknowledged the serious impropriety of the conduct, and then proceeded to the sole disputed issue—that of prejudice.

In the circumstances, we are satisfied that the SJC fully accepted that—apart from the issue of whether there was prejudice—the withholding of the report implicated constitutional as well as other rights. We are also satisfied that Johnson was granted a fair procedure for litigating his constitutional claims. This being so, and given the SJC's finding of no prejudice, we hold that, quite apart from our own assessment of the prejudice issue in section 2, *supra,* Johnson is now barred by principles of collateral estoppel from proceeding with his claims under § 1983. We affirm summary judgment in favor of Mahoney on Count I.

---

**12.** The SJC, Massachusetts' highest court, is fully empowered to decide federal constitutional issues and frequently does so. *Nadworny v. Fair,* 872 F.2d 1093, 1101 (1st Cir.1989). There is no suggestion here that the SJC or Massachusetts courts denied to Johnson "fair procedures for the litigation of constitutional claims." *Allen,* 449 U.S. at 101, 101 S.Ct. 411.

## B. Conspiracy to Violate § 1983 (Count II)

Because the absence of prejudice and the bar of collateral estoppel prevents Johnson from proceeding with his claims under § 1983, we also affirm summary judgment in favor of Mahoney and Keeler on Count II. *See Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988) ("For a conspiracy to be actionable under section 1983 the plaintiff has to prove that 'there [has] been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws.' ") (quoting *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980)).

### III. Conclusion

The SJC's conclusion, as well as our own independent finding, that the improper withholding of the police reports summarizing the interviews of Johnson and his mother did not prejudice Johnson precludes him from proceeding with his claims under § 1983. Therefore, we *affirm* the district court's order granting summary judgment in favor of Mahoney and Keeler.

### ORDER OF COURT

We reject petitioner's request for rehearing. Insofar as rehearing is sought because our collateral estoppel ruling is said to overlook the requirement that the applicable judgment be final and valid, this argument is made for the first time upon petitioning for rehearing. This court has repeatedly held that "a party may not raise new and additional matters for the first time in a petition for rehearing." *United States v. Bongiorno*, 110 F.3d 132, 133 (1st Cir.1997) (citing *American Policyholders Ins. Co. v. Nyacol Prods., Inc.*, 989 F.2d 1256, 1264 (1st Cir.1993); *Kale v. Combined Ins. Co.*, 924 F.2d 1161, 1169 (1st Cir.1991); *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 397 (1st Cir.1990)). *See also United States v. Padilla*, 415 F.3d 211, 218 (1st Cir.2005).

Even, however, were we to consider the argument at this stage, it seems unlikely—although we do not now decide the issue, given the earlier failure to raise it—that *Commonwealth v. Kent K.*, 427 Mass. 754, 696 N.E.2d 511 (1998) would be found to be a vacated or invalid judgment for collateral estoppel purposes, as alleged. Petitioner says this invalidity follows from the fact that Johnson's conviction was later vacated in the trial court by reason of new evidence. However, the opinion of the Massachusetts Supreme Judicial Court in *Commonwealth v. Kent K.* was not thereafter expressly withdrawn or vacated; the S.J.C. itself has continued to cite the opinion as precedent. *See, e.g., Commonwealth v. Ruiz*, 442 Mass. 826, 837, 817 N.E.2d 771 (2004); *Commonwealth v. Martinez*, 437 Mass. 84, 88, 769 N.E.2d 273 (2002). There is no reason to suppose that the *Kent K.* court would have analyzed the evidence of record in that case differently now, even though the S.J.C. would today recognize that new evidence not then available had led to vacation of Johnson's conviction. The status of the S.J.C.'s judgment in *Kent K.* might be analogized to Fed. R. Civ. P. 60(b), which allows a court to relieve a party from a final judgment by reason of newly discovered evidence, but also provides that a 60(b) motion "does not affect the finality of a judgment or suspend its operation." *United States v. One Urban Lot*, 882 F.2d 582, 585 (1st Cir. 1989).

We also reject petitioner's contention that the panel failed to apply the correct standard on summary judgment regarding the prejudice at the bench trial. While the panel discussed various appellate arguments, it found in essence that no reasonable jury would have been able to find prejudice of the requisite sort on the record presented. There is no triable issue.

*Petition for panel rehearing denied.*